STATE OF MISSISSIPPI v. HARRY C. ALLEY.

[51 South. 467.]

**1. INSURANCE.** *Regulation. Code 1906, § 2559. Companies subject thereto. Determination.*

Whether a company or an association is engaged in an insurance business, under Code 1906, § 2559, defining insurance companies subject to inspection and regulation by the state, is not determined: by its name or claims, but by the character of the business which it transacts.

**2. SAME.** *Same. Definition of words "company" and "insurance company." Code 1906, § 2562.*

Under Code 1906, § 2562, defining the meaning of the word "company" and the words "insurance company" as used in the Code 1906, chapter entitled "Insurance" and regulating the business of insurance, all organizations doing an insurance business of any kind or on any plan are subject to state inspection and regulation under said chapter.

**3. SAME.** *Same. Insurance contract defined. Code 1906, § 2563.*

Under Code 1906, § 2563, defining an insurance contract as "an agreement by which one party for a consideration promises to pay money or its equivalent or do some act of value to the assured upon the destruction, loss or injury of something in which the other party has an interest," a fire policy for a designated sum of money on property of value more than double said sum issued by a lumbermen's underwriters' association, composed of a number of persons, firms, etc., is an insurance contract.

---

---

4. SAME. *Same. Nature of business. One kind of property alone insured. Code 1906, chapter entitled "Insurance."*

The question whether an association is doing an insurance business within the meaning of Code 1906, chapter entitled "Insurance," regulating the business of insurance, is not affected by the fact that it insures only against loss on one kind of property.

5. SAME. *Same. Right of state to regulate.*

The state has the right to regulate the business of insurance.

6. SAME. *Same. Statutory construction.*

Statutes regulating insurance should be liberally construed to bring within their provisions and remedial purposes all associations organized to conduct the insurance business, however complex and obscure the plan devised for carrying it on.

7. SAME. *Same. Nature of company.*

An insurance association, having some features incident to a stock company and some to a mutual company, but being neither, may be classified as a "mixed association."

8. SAME. *Same. Profit as an element of business.*

An insurance association does not lose its character as such because cheap insurance is the only element of profit to its members and the only object they have in joining it.

9. WORDS AND PHRASES. *Party. Comprehensiveness of the term.*

The word "party" properly and naturally embraces a unit, composed of more than one, several or many, as well as a single individual.

10. CRIMINAL LAW AND PROCEDURE. *Doing unauthorized insurance business. Foreign company. Question for determination. Right of private contract. Code 1906, § 2643.*

A prosecution, under Code 1906, § 2643, making it unlawful to act as an agent for an insurance company without license from the state, wherein the defense is that the company's plan of insurance was not within the statute, presents no question as to the right of an individual to contract with it and hence does not raise the question of the constitutionality of the statutes regulating insurance companies as invading the right of private contract.

11. SAME. *Same. Case.*

Where a number of lumber manufacturers secured fire insurance on their mills by joining an association called "manufacturing lumbermen's underwriters," an organization having no capital

96 Miss.—46

other than the premiums paid by its members, one-fourth of which was used to compensate a non-resident attorney in fact, the association is but an insurance company and its carrying on without license of business in this state was unlawful, although cheaper insurance was the only profit derived by its members and only such manufacturers could join the association as were approved by the attorney in fact and an advisory board who managed its affairs.

FROM the circuit court of Lauderdale county.

HON. J. L. BUCKLEY, Judge.

Alley, appellee, was tried on the charge of unlawfully assuming to act as a soliciting insurance agent for a foreign insurance company, in violation of the statute law of this state. From a judgment in favor of appellee the state appealed to the supreme court.

The facts relative to this case are fully set forth in the following agreed statement:

It is agreed by and between F. M. West, attorney for the state insurance department of Mississippi, and L. C. Boyle, attorney for defendant above named, that on the 22d day of May, A. D. 1908, W. J. Miller, deputy insurance commissioner of the state of Mississippi, made an affidavit before E. Nichols, a justice of the peace in and for district No. 4 of Lauderdale county, Miss., charging that the said Harry C. Alley did unlawfully in the said county and state, on the 22d day of May, A. D. 1908, at Meehan Junction, in said district, county, and state, unlawfully assume to act as an insurance agent by soliciting insurance and attempting to insure against destruction by fire the property of the Cotton States Lumber Company at said Meehan Junction, Miss., without first securing a license from the insurance commissioner of the state of Mississippi to act as such insurance agent; the affidavit concluding with the clause "against the peace and dignity of the state of Mississippi." It is further agreed by above-named counsel that the said W. J. Miller, deputy insurance commissioner as before said, did on

the 22d day of May, A. D. 1908, before E. Nichols, a justice of the peace in and for district No. 4 of Lauderdale county, state of Mississippi, make affidavit that the said Harry C. Alley, the defendant above named, did on the 22d day of May, A. D. 1908, at Meehan Junction, in. said district, county, and state, unlawfully solicit insurance and attempt to insure the property of the Cotton States Lumber Company at Meehan Junction, Miss., in the Manufacturing Lumbermen's Underwriters, same being a foreign insurance company not admitted to do business in this state; the affidavit concluding with the clause "against the peace and dignity of the state of Mississippi." It is agreed by above-named counsel that the said affidavits charge two separate and distinct offenses, as appears from the said affidavits, and that said affidavits were made by the said W. J. Miller, as deputy insurance commissioner of the state of Mississippi, upon information and belief.

It is further agreed by said counsel that the records in the office of the insurance commissioner of the state of Mississippi show that the said Harry C. Alley has not procured from the said insurance commissioner a certificate of authority that the said Manufacturing Lumbermen's Underwriters has complied with the laws of the state of Mississippi relating to insurance and authorized to transact an insurance business in said state and that said Alley was authorized to represent them; and it is further agreed by said counsel that the records of the office of the said insurance commissioner show that the said Harry C. Alley has not paid to the said insurance commissioner the privilege tax required of an insurance agent by the laws of the state of Mississippi. It is further agreed by the said counsel that the records of the said office of the said insurance commissioner show that the said Manufacturing Lumbermen's Underwriters are not licensed by the insurance department of the state of Mississippi to do an insurance business in the state of Mississippi. It is further agreed that the said Harry C. Alley was

on the 22d day of May, A. D. 1908, arrested upon the charges contained in said affidavits, and that he gave bond, with good and sufficient sureties as provided by law, in the sum of $150 in each case, guaranteeing his appearance before Hon. E. Nichols, justice of the peace of the aforesaid district, county, and state, at a regular court day to be held by said justice of the peace at Meehan Junction, Miss., on the 16th day of June, A. D. 1908.

The plan comprehends an exchange of contracts between manufacturing lumbermen whereby the mill properties of such manufacturers will be protected against loss from fire. None but manufacturing lumber concerns enter into these contracts, and then only such concerns whose business and moral standing and methods are such as to make them respectively satisfactory to all who have entered into such contractual relation. Owing to the number of contracts thus written, the exchange of contracts is accomplished through the medium of an attorney in fact, to wit, Harry Rankin & Co. Each concern entering into contractual relation executed its separate power of attorney to said Harry Rankin & Co. All powers of attorney are to same effect and purpose as Exhibit A. For convenience of expression the concerns entering into these contracts are called "subscribers." The attorney in fact acts under direction of an advisory committee, which committee is selected from among the "subscribers" and serves without pay. One of the "subscribers" acts as treasurer. The details of the arrangement are not fully set forth in any written instruments, or further than in writings hereinafter referred to, but are found in the transactions actually executed through attorneys in fact under the direction of an advisory committee as hereinafter set forth; the interest on the individual participants being protected from any unsatisfactory action by the privilege of withdrawal at any time. A subscriber's application, power of attorney, and note being satisfactory to the subscribers, a contract is executed to him in the form of the con-

tract the basis of complaint herein, a copy of which is attached, marked "Exhibit B"; the clauses of the printed slip attached varying with circumstances, and the contract being executed by each and all the then subscribers.

Upon the delivery of the contract, the subscriber pays to the attorneys in fact, and they deliver to the treasurer, the amount of the premium stipulated in the policy; the rate being fixed in each case at the rate commonly charged for the similar risks by reputable and responsible corporations engaged in the business of writing insurance for profit, and the terms of the contract, from the words "in consideration of the stipulations herein named," being copied from the standard forms used by corporations engaged in the business of writing insurance for profit, except the words "for each subscriber the sum opposite his name on the reverse side hereof" and the paragraph near the end of the contract, beginning with the words "In event of litigation herein." The individual amount of indemnity which each subscriber agrees to exchange by the terms of each of such respective contracts executed by him, it, or them to each of the other subscribers is determined by the relative risk against which he, it, or they may be indemnified, so that the indemnity is exchanged by each subscriber with the others on a proportionate basis; that is to say, if the subscriber is indemnified in a large sum, on a greater risk, he undertakes to indemnify each of the others in a larger proportionate amount, and if the risk indemnified be smaller the indemnity he exchanges with other subscribers respectively and severally is relatively smaller. The amount of the maximum indemnity to which the power of attorney limits the contemplated liability of each subscriber to any other subscriber is fixed in the same way in relation to the risk against which such subscriber is indemnified. The premium paid by the subscriber to whom contract of indemnity has been issued, when paid to the treasurer, is credited to the several other subscribers in the same proportion in which they have assumed lia-

bility toward the subscriber paying the premium. The sums thus credited are kept in separate and distinct accounts for each subscriber. From these funds thus kept, together with the amount agreed to be paid the attorneys in fact for compensation for services and expenses, is deducted, in case of indemnified loss by a subscriber, the proportion of the loss of such subscriber which the amount for which the other subscribers agreed to indemnify him, it, or them bears to the total amount of indemnity given to the subscriber suffering the loss.

The premiums collected by corporations writing insurance for profit are fixed by experience at a sum sufficient to pay the average of losses and an average expense of making the business of about 40 per cent. of the total premiums paid, together with a profit on the business, and the premiums collected under arrangement herein referred to are expected to be, and have been during the ten years the arrangement carried on under the phrase "Manufacturing Lumbermen's Underwriters" has been in effect, sufficient to more than pay all expenses and losses and effect a saving of more than $700,000 to the subscribers. The indemnity exchanged is upon scattered properties, no two of which could suffer in a common calamity; but, to provide a convenient method of collecting additional funds in case of the coincidence of numerous separate disasters, the nonnegotiable notes assessable by the advisory committee are taken. These notes do not limit in any way the amount of the individual liabilities of each subscriber to the others respectively and severally, and are only provided as a convenience for collection and payment in the event of necessity and to the amount thereof. The surplus in the funds derived from premiums and credited to the respective subscribers, after the payment annually of expenses and indemnity, is left to accumulate until such accumulated surplus equals the amount of each note, and thereafter such surplus is annually returned to the subscribers. In the event any subscriber desires to cancel his contract he may do so at any time,

and his indemnity and the indemnity undertaken by him is canceled against each other subscriber, the amount of any accumulated surplus, his note (if not already returned), and the amount of premium not expended for indemnity is returned to him, so that at all times the expenditures of each subscriber represent the amount of the average loss of all subscribers exchanging indemnity therefor which the indemnity given him, it, or them bears to the aggregate indemnity exchanged, plus the subscriber's payment towards expenses. No subscriber can make any profit on any fund contributed by him, except from interest on investment of funds so contributed, or seeks or expects any benefit from the arrangement except to secure indemnity from other subscribers at the cost of the average actual loss on risks of the kind against which he, it, or they are indemnified, plus the fixed expenses of carrying out the arrangement aforesaid. Participation in the arrangement is not sought or permitted among the general public, or even among manufacturing lumbermen not considered desirable therein. There is now in the hands of the treasurer to the credit of the several subscribers in the aggregate the sum of $560,000, exclusive of the notes aforesaid, aggregating $469,500.

The Cotton States Lumber Company expressed a desire to enter into contractual relations with subscribers. Alley, the defendant, at the direction of Rankin & Co., went to Meehan Junction, Miss., and examined the property, and made a full report of the physical condition of the risk. The Cotton States Lumber Company executed its power of attorney and delivered same to Alley, whereupon Alley forwarded same to Rankin & Co., at Kansas City, Mo., whereupon Rankin & Co., as attorneys in fact for subscribers, sent contract (Exhibit B) via United States mail to the Cotton States Lumber Company, at Meehan Junction, Miss. The terms "insurance," "premium," "policy," and other terms commonly used in the business of insurance, have been used in this stipulation for convenience as well under-

stood general significance. But it is understood that it is not intended to stipulate that the use thereof in this stipulation or said writings shall be taken as an agreement that said Alley was at the time and place aforesaid engaged in the business of insurance within the purview of the Mississippi statute pertaining to insurance; that being a matter of law to be determined by the court upon the facts herein set forth.

It is further agreed that the affidavits as hereinbefore referred to, charging the aforesaid offenses alleged to have been committed by the said Harry C. Alley, are to be construed by the court in determining the sufficiency of the charges and the formality of allegation, and the court is not to be controlled in determining the sufficiency of the allegations in the affidavits to show the commission of illegal acts charged by this agreement, but is to be controlled by the affidavits themselves and in the law applicable thereto.

### Exhibit A—Power of Attorney.

"Whereas, there has been established in the office of Harry Rankin & Company, in Kansas City, Missouri, a bureau where manufacturers of lumber and lumbermen may exchange insurance, such bureau being called 'Manufacturing Lumbermen's Underwriters':

"Now, therefore, we, The Cotton States Lumber Company, Meehan Junction, Mississippi, as subscribers to said Manufacturing Lumbermen's Underwriters, hereby appoint Harry Rankin & Company (as now or hereafter constituted) our attorneys, for us, and in our name, place, and stead, to exchange insurance with subscribers to said Manufacturing Lumbermen's Underwriters; to accept and make binding upon us application for such insurance; to subscribe with our name, issue, change, modify, reinsure, or cancel policies of insurance therefor, containing such term, clauses, conditions, warranties, and agreements as they deem best; to demand, receive, collect, and receipt

for all premiums; to perform or waive all agreements or stipulations of any such policies; to adjust and settle all losses; to receive, give, or waive any notices or proofs of loss; to appear for us in any suits, actions, or proceedings, and bring, defend, prosecute, compromise, settle, or adjust the same; and in general, no matter whether specifically authorized herein or not, to do or perform every act that we ourselves could do in relation to the making, performance, compromise, settlement, or adjustment of any contract of insurance hereby authorized.

"As the purpose of this power of attorney is only to enable us through our attorneys to exchange insurance with other subscribers, the exercise of the power hereby granted shall be strictly confined to such purpose and be subject to the following limitation, viz.: First, our liability on any one risk shall be limited to seven hundred and fifty dollars; second, our attorneys shall not have power to bind us for the obligation of any other subscriber, but he shall bind us separately and for ourselves alone; third, our attorneys shall only bind us upon the same terms and conditions that they shall bind other equal subscribers.

"In order that the acts hereby authorized may be properly carried on, the same shall be conducted subject to the following regulations, viz.:

"First. An advisory committee, composed of subscribers, shall be elected annually for a term expiring the first Tuesday in December of each year, and in annually choosing successors our attorneys are authorized to ask all subscribers to vote for whom they desire to serve as such committee. Said committee shall select a treasurer, and he and said attorneys shall give bond to said committee for the safety of funds and securities in such sum as said committee shall require. All moneys that may come into the hands of our attorneys shall be deposited in banks or invested in securities, subject to the approval of such committee, and all disbursements shall be by check, signed by said attorneys,

and countersigned by the treasurer, and they are authorized to pay out of our funds in their possession our proportion of any loss as adjusted or compromised. If any member of said committee shall cease to write insurance, or if his power of attorney be revoked or canceled, he shall cease to be a member of the committee and the remaining members shall fill the vacancy. Said committee shall serve until their successors are chosen. The powers herein conferred upon said attorneys may, at any time, be deputed by them to any other person they may select,. subject to the written approval of the majority of the said committee.

"Second. Said attorneys shall keep separate accounts of all moneys due us, which, together with the accounts of all other subscribers, shall be at all times open to our inspection. As. compensation to them, said attorneys may deduct from all premium moneys of ours that may come into their hands twenty-five per cent. thereof, in consideration whereof they shall defray all. expenses incident to the business hereby authorized, except legal expenses, of which we shall bear our pro rata share. Said attorneys may transfer their office to any other place or places in the United States.

"Third. The subscribers shall have no joint funds, capital or stock, nor shall business be conducted by them jointly, nor shall they have any power to bind each other, but each shall act separately and not for any others.

"Fourth. The advisory committee shall set aside out of our savings a net surplus equal to the amount of the note herewith. given, and all other savings shall be returned to us annually in cash.

"Fifth. This instrument may be revoked or canceled at any time by either party giving to the other party ten days' notice in writing, and thereupon our attorneys shall cancel all unexpired insurance granted by us through them, and within thirty days completely liquidate our accounts and return to us our net

surplus, unearned premium, and note.

"In witness whereof, we have hereunto set our hands and seals this 22nd day of May, 1908.

"[Signed]                    The Cotton States Lumber Co.,
                             "G. G. Davidge, Pres.
                             "J. B. Hern, Secy."

Note.

"$1,500.00.            Kansas City, Mo., May 22d, 1908.

"For value received we promise to pay to the advisory committee of the Manufacturing Lumbermen's Underwriters fifteen hundred dollars, as said committee may assess, to pay excess losses incurred under our contract above as 'individual underwriters.' This note is not negotiable, draws no interest, and is given for the purpose above specified only.

"[Signed]                    The Cotton States Lumber Co.,
                             "G. G. Davidge, Pres.
                             "J. B. Hern, Secy."

Exhibit B—Policy.

"No. 4696.                              $3,000.00

"The undersigned persons, firms, and corporations, known as 'Subscribers at Manufacturing Lumbermen's Underwriters,' each person or firm, or corporation acting exclusively for such person or firms, or corporation, and not for any other or others, and each represented under separate power of attorney by Harry Rankin & Company, of Kansas City, county of Jackson, and state of Missouri, and it being understood that, wherever in this policy the word 'company' occurs, it means and shall be taken and construed as meaning the persons, firms, or corporations whose names are subscribed to said policy by their said attorneys, and as a part of this contract contained in this policy that each of the subscribers hereto has entered into an agreement with each of the other subscribers to insure property against loss or damage by fire to the several amounts respectively authorized

by said agreement, upon the terms and conditions in said agreement expressed, which said agreement is hereby made a part of this contract, it being thereby provided that no subscriber shall in any event be made jointly liable with the others, or with any one or any of the others, or otherwise than severally, in consideration of the stipulations herein named and of the payment at the rate of three and 50/100 dollars per annum per hundred dollars premium, does insure the Cotton States Lumber Company for the term of one year from the twenty-second day of May, 1908, at noon, to the twenty-second day of May, 1909, at noon, against all direct loss or damage by fire, except as hereinafter provided, to an amount in dollars and cents not exceeding for each subscriber the sum opposite his name on the reverse side hereof to the following described property, while located and contained as described herein and not elsewhere, to wit:

(Printed slip attached to policy.)

Cotton States Lumber Company.
Steam Turpentine Plant.

This policy covers $3,000, being pro rata on the following specific concurrent insurance, to-wit:

$ 600.00—On their frame, ironclad, metal roof building, known as 'Crude Building.'

3,450.00—On machinery, fixed and movable, of every description, contained therein.

300.00—On their frame, ironclad, metal roof building, known as 'Power House.'

1,350.00—On the machinery, fixed and movable, of every description, contained therein.

350.00—On their frame, ironclad building, metal roof, known as 'Refinery Building.'

1,500.00—On machinery, fixed and movable, of every description, contained therein.

150.00—On their frame, metal roof office and laboratory building.

$8,000.00—Total concurrent increase herewith permitted.

It is understood and agreed that a competent watchman shall be kept day and night on the premises, who will be provided with an electric torch, that no artificial lights shall be used or allowed on the premises,

and that ordinary alterations, additions, and repairs may be made from time to time as occasion may require, and the plant may cease operations. for thirty days when necessary.

Three-Fourths Value Clause.—It is understood and agreed to be a condition of this insurance that, in the event of loss or damage by fire to the property insured under this policy, this company shall not be liable for an amount greater than three-fourths of the actual cash value of each item of property insured by this policy (not exceeding the amount insured in each such item) at the time immediately preceding such loss or damage; and in the event of additional insurance, if any is permitted thereon, then this company shall be liable for its proportion only of three-fourths such cash value of each item insured at the time of the fire, not exceeding the amount insured on each such item.

Electric Light Permit.—Privilege to use electric lights in the above-mentioned premises when the electric equipment is in full compliance with the standard requirements, but it is mutually understood and agreed that this policy shall not cover said electric light apparatus and attachments unless specifically and separately insured.

Lightning Clause.—This policy shall cover any direct loss or damage caused by lightning (meaning thereby the commonly accepted use of the term 'lightning,' and in no case to include loss or damage by cyclone, tornado, or wind-storm) not exceeding the sum insured nor the interest of the insured in the property, and subject in all other respects to the terms and conditions of this policy: Provided, however, if there be any other insurance on said property, this company shall be liable only pro rata with each other insurance for any direct loss by lightning, whether such other insurance be against direct loss by lightning or not.

Attached to and forming part of policy No. 4696 of the Manufacturing Lumbermen's Underwriters.

Manufacturing Lumbermen's Underwriters,.<br>Harry Rankin & Company.

"This company shall not be liable beyond the actual cash value of the property at the time any loss or damage occurs, and the loss or damage shall be ascertained or estimated according to such actual cash value, with proper deduction for depreciation, however caused, and shall in no event exceed what it would then cost the insured to repair or replace the same with material of like kind and quality. Said ascertainment or estimate shall be made by the insured and this company, or, if they differ, then by appraisers, as hereinafter provided, and, the amount of loss.

·or damage having been thus determined, the sum for which this
·company is liable pursuant to this policy shall be payable sixty
·days after due notice, ascertainment, estimate, and satisfactory
proof of the loss have been received by this company, in accord-
ance with the terms of this policy.    It shall be optional, how-
.ever, with this company to take all, or any part, of the articles
·at such ascertained· or appraised value, and also to repair, re-
build, or replace the property lost or damaged with other of like
kind and quality within a reasonable time on giving notice, with-
in thirty days after the receipt of the proof herein required, of
its intention so to do, but there can be no abandonment to this
·company of the property described.    ·

"This entire policy shall be void if the insured has concealed
·or misrepresented, in writing or otherwise, any material fact
or circumstance concerning this insurance or the subject thereof,
or if the interest of the insured in the property be not truly stated
herein, or in case of any fraud or false swearing by the insured
touching any matter relating to the insurance or the subject
thereof, whether before or after a loss.

"The entire policy, unless otherwise provided by agreement
indorsed hereon or added hereto, shall be void if the insured now
has or shall hereafter make or procure any other contract of
insurance, whether valid or not, on property covered in whole
·or in part by this policy, or if the hazard be increased by any
means within the control or knowledge of the insured, or if
the interest of the insured be other than unconditional and sole
ownership, or if any change, other than by the death of an
insured, take place in the interest, title, or possession of the
subject of insurance (except change of occupants without in-
·crease of hazard), whether by legal process or judgment or by
voluntary act of the insured or otherwise, or if this policy be
assigned before a loss, or if illuminating gas or vapor be gen-
erated in the described building (or adjacent thereto) for use
therein, or if (any usage or custom of trade or manufacture to

the contrary notwithstanding) there be kept, used, or allowed on the above-described premises benzine, benzole, dynamite, ether, fireworks, gasoline, Greek fire, gunpowder exceeding twenty-five pounds in quantity, naphtha, nitroglycerine, or other explosives, phosphorus, or petroleum or any of its products of greater inflammability than kerosene oil of the United States standard (which last may be used for lights and kept for sale according to law, but in quantities not exceeding five barrels, provided it be drawn and lamps filled by daylight or at a distance not less than ten feet from artificial light), or if a building herein described, whether intended for occupancy by owner or tenant, be or become vacant or unoccupied and so remain for ten days.

"This company shall not be liable for loss caused directly or indirectly by invasion, insurrection, riot, civil war or commotion, or military or usurped power, or by order of any civil authority, or by theft, or by neglect of the insured to use all reasonable means to save and preserve the property at and after or when the property is endangered by fire in neighboring premises, or (unless fire ensues, and in that event for the damage by fire only) by explosion of any kind, or lightning, but liability for direct damage by lightning may be assumed by specific agreement thereon. If a building or any part thereof fall, except as the result of fire, all insurance by this policy on such building or its contents shall immediately cease.

"This company shall not be liable for loss to accounts, bills, deeds, evidences of debt, money, notes, or securities; nor, unless liability is specifically assumed hereon, for loss to awnings, bullion, casts, curiosities, drawings, dies, implements, jewels, manuscripts, medals, models, patterns, pictures, scientific apparatus, signs, store or office furniture or fixtures, sculpture, tools, or property held on storage, or for repairs, nor, beyond the actual value destroyed by fire, for loss occasioned by ordinance or law regulating construction or repair of buildings, or by interruption

of business, manufacturing processes, or otherwise; nor for any greater proportion of the value of plate glass, frescoes, and decorations than that which this policy shall bear to the whole insurance on the building described.

"If an application, survey, plan, or description of property be referred to in this policy, it shall be a part of this contract and a warranty by the insured.

"In any matter relating to this insurance, no person, unless duly authorized in writing, shall be deemed the agent of this company.

"This policy may by a renewal be continued under the original stipulations, in consideration of premium for the renewal term, provided that an increase of hazard must be made known to this company at the time of renewal, or this policy shall be void.

"This policy shall be canceled at any time at the request of the insured, or by the company by giving ten days' notice of such cancellation. If this policy shall be canceled as hereinbefore provided, or become void or cease, the premium having been actually paid, the unearned portion shall be returned on surrender of this policy, or last renewal, this company retaining the customary short rate, and the expense of obtaining, inspecting, and writing this risk, except that when this policy is canceled by this company by giving notice it shall retain only the pro rata premium.

"If, with the consent of this company, an interest under this policy shall exist in favor of a mortgagee, or of any person or corporation having an interest in the subject of insurance other than the interest of the insured as described herein, the conditions hereinbefore contained shall apply in the manner expressed in such provisions and conditions of insurance relating to such interest as shall be written upon, attached, or appended hereto.

"If property covered by this policy is so endangered by fire as to require removal to a place of safety, and is so removed,

that part of this policy in excess of its proportion of any loss and of the value of property remaining in the original location shall for the ensuing five days only cover the property so removed in the new location; if removed to more than one location, such excess of this policy shall cover therein for such five days in the proportion that the value in any one such new location bears to the value in all such new locations, but this company shall not, in any case of removal, whether to one or more locations, be liable beyond the proportion that the amount thereby insured shall bear to the total insurance on the whole property at the time of fire, whether the same cover in new location or not.

"If fire occur, the insured shall give immediate notice of any loss thereby in writing to this company, protect the property from further damage, forthwith separate the damaged and undamaged personal property, put in the best possible order, make a complete inventory of the same, stating the quantity and cost of each article, and the amount claimed thereon, and within sixty days after the fire, unless such time is extended in writing by this company, shall render a statement to this company, signed and sworn to by said insured, stating the knowledge and belief of the insured as to the time and origin of the fire, the interest of the insured and of all others in the property, the cash value of each item thereof and the amount thereof and the amount of loss thereon, all incumbrances thereon, all insurance, whether valid or not, covering any of said property, and a copy of all of the descriptions and schedules in all policies, any change in the title, use, occupation, location, possession, or exposures of said property since the issuing of this policy, by whom and for what purpose any buildings herein described and the several parts thereof were occupied at the time of fire, and shall furnish, if required, verified plans and specifications of any building, fixtures, or machinery destroyed, and shall also, if required, furnish a cer-

96 Miss.—47

tificate of the magistrate or notary public (not interested in
the claim as a creditor or otherwise, nor related to the insured)
living nearest to the place of fire, stating that he has examined
the circumstances and believes the insured has honestly sus-
tained loss to the amount that such magistrate or notary public
shall certify.

"The insured, as often as required, shall exhibit to any per-
son designated by this company all that remains of any prop-
erty herein described, and submit to examinations under oath
by any person named by this company, and subscribe the same,
and, as often as required, shall produce for examination all
books of account, bills, invoices, and other vouchers, or certified
copies thereof of originals, if lost, at such reasonable place as
may be designated by this company or its representative, and
shall permit extracts and copies thereof to be made.

"In the event of disagreement as to the amount of loss, the
same shall, as above provided, be ascertained by two competent
and disinterested appraisers, the insured and this company
each selecting one, and the two so chosen shall first select a com-
petent and disinterested umpire. The appraisers together shall
then estimate and appraise the loss, stating separately sound
value and damage, and, failing to agree, shall submit their
differences to the umpire; and award in writing of any two
shall determine the amount of such loss. The parties thereto
shall pay the appraisers respectively selected by them and shall
bear equally the expenses of the appraisal and umpire.

"This company shall not be held to have waived any pro-
vision or condition of this policy, or any forfeiture thereof,
by any requirement, act, or proceeding on its part relating to
the appraisal or to any examination herein provided for; and
the loss shall not become payable until sixty days after the
notice, ascertainment, estimate, and satisfactory proof of the
loss herein required have been received by this company, in-

cluding an award by appraisers when appraisal has been required.

"This company shall not be liable under this policy for a greater proportion of any loss on the described property, or for loss by and expense of removal from premises endangered by fire, than the amount hereby insured shall bear to the whole insurance, whether valid or not, or by solvent insurers, covering such property, and the extent of the application, of the insurance under this policy, or of the contribution to be made by this company in case of loss, may be provided for by agreement or condition written hereon or attached or appended hereto. Liability for reinsurance shall be as specifically agreed hereon.

"If this company shall claim that the fire was caused by the act or neglect of any person or corporation, private or municipal, this company shall, on payment of the loss, be subrogated, to the extent of such payment, to all right of recovery by the insured on receiving such payment. No suit or action on this policy, for the recovery of any claim, shall be sustainable in any court of law or equity until after full compliance by the insured with all the foregoing requirements, nor unless commenced within twelve months next after the fire.

"Wherever in this policy the word 'insured' occurs, it shall be held to include the legal representatives of the insured; and wherever the word 'loss' occurs, it shall be deemed the equivalent of 'loss and damage.' If this policy be made by a mutual or other company having special regulations lawfully applicable to its organization, membership, policies, or contracts of insurance, such regulations shall apply to and form a part of this policy as the same may be written or printed upon, attached or appended hereto.

"In the event of litigation herein, to avoid a multiplicity of suits, no suit or other proceedings at law or in equity shall be begun or maintained for the recovery of any claim upon, under, or by virtue of this policy against more than one of the under-

writers hereon at any time, nor in any court other than the highest court of original jurisdiction; and that a final decision in such suit, or other proceedings, shall be taken to be decisive of the similar claim, so far as the same may subsist, against each of the other underwriters hereon, absolutely fixing his liability in the premises, each of the underwriters hereon, in consideration of this entire stipulation, so far as he individually is or may be concerned, expressly agrees to, except, however, as to the matter of costs and disbursements. And the attorneys are hereby authorized as to each underwriter hereon to receive and admit service of person in any suit or other proceedings begun or maintained as aforesaid.

"This policy is made and accepted subject to the foregoing stipulations and conditions, together with such other provisions, agreements, or conditions as may be indorsed hereon or added hereto, and no officer, agent, or other representative of this company shall have power to waive any provision or condition of this policy, except such as by the terms of this policy may be the subject of agreement indorsed hereon or added hereto, and as to such provisions and conditions no officer, agent, or representative shall have such power or be deemed or held to have waived such provisions or conditions, unless such waiver, if any, shall be written upon or attached hereto, nor shall any privilege or permission affecting the insurance under this policy exist or be claimed by the insured unless so written or attached."

The above policy sets out the various amounts for which each subscriber assumes liability to the insured in case of loss, and is signed by Harry Rankin & Co. as attorneys in fact for the Manufacturing Lumbermen's Underwriters.

*F. M. West,* for appellant.

It can hardly be denied that the things done by the appellee at Meehan Junction brings him clearly within Code 1906,

§ 2615, and he is, therefore, an agent. The appellee does not deny that he solicited the insurance of the Cotton States Lumber Company at Meehan Junction; nor does he deny that he had the necessary legal permission to act as an insurance agent; nor does he deny that the Manufacturing Lumbermen's Underwriters had not been authorized by the insurance department to transact business in the state; on the contrary all of this is admitted; nor is it denied that the insurance was affected through appellee's efforts and solicitations, and the policy delivered to the Cotton States Lumber Company in due course. If the Manufacturing Lumbermen's Underwriters is an insurance company issuing a contract of insurance, it is subject to supervision by the state, and the appellee should have been convicted as charged in the affidavit. Code 1906, § 2563, defines a contract of insurance to be as follows: "A contract of insurance is an agreement by which one party for a consideration promises to pay money or its equivalent or to do some act of value to the assured, upon the destruction, loss, or injury of something in which the assured or other party has an interest." 22 Cyc. 1384 defines a contract of insurance as follows: "Insurance is a contract by which the one party, in consideration of a price paid to him adequate to the risk, becomes security to the other that he shall not suffer loss, prejudice, or damage by the happening of the perils specified to certain things which may be exposed to them." In the early case of *Tyler v. New Amsterdam Ins. Co.,* 4 Rob. (N. Y.) 151, a contract of insurance is said to contain five necessary ingredients, as (1) the subject matter; (2) the risk insured against; (3) the amount; (4) the duration of risk; (5) the premium of insurance. A contract of insurance that lacks any of these necessary elements is incomplete.

The following states, in addition to Mississippi, have statutory definitions of insurance: Alabama Civ. Code, 1896, § 2575; Kentucky Statutes (1903), § 641; Mass. Rev. Laws (1902),

pages 1120, 1121; Shannon's Code (Tenn.), § 3274; Texas
Rev. Statutes (1895), article 3096*a;* Ballinger Ann. Codes &
Stat. Wash. (1897), § 2838.

Even though our Mississippi statute has not declared a
contract of insurance to be one of indemnity, the law reports
of every state in the union, and.of foreign countries, contain
sufficient authority decisive thereof.

Now, the contract herein concerned having stated that each
of the members has entered into an agreement to insure against
loss by fire the other members thereof, further recites that in
consideration of the stipulations herein named and of the pay-
ment at the rate of, etc., does insure the Cotton States Lumber
Company for the term of one year against all direct loss or
damage by fire. Here is the complete contract. The agree-
ment to insure and the agreement that they have insured. In-
sured against what? Insured against fire. Our statute, Code
1906, § 2563, applies to this contract. The Manufacturing
Lumbermen's Underwriters can hardly deny that it issued a
contract of insurance and that the contract is one of indemnity
against loss by fire. Is the Manufacturing Lumbermen's Un-
derwriters an insurance company? Code 1906, § 2562, de-
fines the term "company" as follows: "When consistent with
the context and not obviously used in a different sense, the
term "company" or "insurance company" as used herein, in-
cludes all corporations, associations, partnerships, or individ-
uals engaged as principals in the business of insurance or
guaranteeing the obligations of others." The Manufacturing
Lumbermen's Underwriters contends that it is not engaged in
the business of insurance; that it makes no profit out of the
scheme; that it is neither a corporation, a firm, nor a partner-
ship; but that the scheme is known as individaul insurance
or inter-insurance, as disclosed in the plan of operation. Ad-
mitting that the Underwriters is not a corporation, firm, or
partnership, but is an association of individuals engaged in

exchanging contracts of indemnity, then if the court holds it to be one of individual insurance, that is, one individual insuring another, and such other insuring the first, then the court must hold that the Manufacturing Lumbermen's Underwriters is an insurance company within the meaning of Code 1906, § 2562.

The plant of the Meehan Lumber Company is located in the state of Mississippi. The last clause of Code 1906, § 2563, says: "All contracts of insurance on property, lives, or interests in this state shall be deemed to be made therein." So, we have the contract of insurance; we have also the property located in Mississippi, with the statute declaring the contract of insurance shall be deemed to be made therein, and we find that the word "company" in Code 1906, § 2562, includes all corporations, associations, partnerships, or individuals engaged as principals.

In the case of *Fidelity, etc., Ins. Co. v. Miazza,* 93 Miss. 18, 46 South. 817, this court, passed upon the validity of Code 1906, § 2563. By section 14, c. 59, page 66, of the laws of 1902 (being the same as § 2563 *supra*), in force at the time of the execution of this contract, it is provided that: "All contracts of insurance on property, lives, or interests in this state shall be deemed to be made therein." This is the law of the state, and no contract of the parties can change it. It follows that the contract is to be construed under the laws of this state. *Grevenig v. Washington, etc., Ins. Co.,* 104 Am. St. Rep. notes 488–492; *Horton v. Home Ins. Co.,* 122 N. C. 498, 29 S. E. 944, 65 Am. St. Rep. 717.

Can it be denied that if A insures B and C and D and so on, in an argument set opposite A's name, that A is agreeing to, and does, indemnify them against loss as a principal? And if B and C and D and so on agree to, and do, insure A against loss by fire in an amount set opposite their respective names, are they not guaranteeing to reimburse A for any loss

he might sustain by fire? They are agreeing to indemnify
each other, and the scheme is one of mutual insurance.

The chapter on insurance in the Code of 1906, was wise and
beneficial legislation for the purpose of protecting the citizens
of Mississippi against unstable insurance, even to the extent of
protecting the citizen against his own lack of knowledge in the
procuring of solvent indemnity against loss by fire or other
contingency. *Fikes v. State,* 87 Miss. 251.

The Manufacturing Lumbermen's Underwriters had not
complied with any statutory provision regulating the admis-
sion of insurance companies into this state; nor had Alley, the
appellee, procured the necessary certificate of authority from
the insurance department, nor had he paid the privilege tax
required of an insurance agent. Code 1906, § 2559, places
the following classes of insurance companies under the super-
vision and inspection of the insurance commissioner: All in-
demnity or guaranteeing companies; all corporations, partner-
ships, associations, individuals, and fraternal orders whether
domestic or foreign, transacting, or to transact the business of
insurance in this state are insurance companies within the
meaning of this chapter, and shall be subject to the inspection
and supervision of the insurance commissioner, etc. It matters
not, therefore, what the courts of other states say as to this
scheme of individual insurance in the case at bar, we have here
a Mississippi statute declaring that individuals transacting, or
to be admitted to transact business, the business of insurance,
in this state are insurance companies.

Premising, then, for the moment, that the contract issued
by the Manufacturing Lumbermen's Underwriters is a con-
tract of insurance; that such contract was made in this state;
we come next to consider the question whether the state of
Mississippi has the right to say that individuals are insurance
companies, within the meaning of this section. It is so well
settled that each state has the right to pass statutes regulating

the control and conduct of insurance companies within its borders, that it would be a consumption of time to cite the many authorities sustaining such regulation. Kerr on Insurance, 22; 22 Cyc. 1387; *Lee Mutual Ins. Co. v. State,* 60 Miss. 395.

Courts cannot release foreign insurance companies from compliance with the conditions imposed by a statute in granting them the right to do business within its borders upon the ground that such conditions are onerous, discriminatory or inexpedient. *Hartford Ins. Co. v. Raymond,* 70 Mich. 485; *Manchester Ins. Co. v. Herriott,* 91 Fed. 711. Thus it is within the power of a state to make a third person who shall in any manner, aid, or assist in transacting any business for an insurance company not organized under its laws an agent of said corporation and to provide that service of summons upon him in a civil suit shall have the effect of service upon the corporation. *Fred Miller Brewing Co. v. Council Bluffs Ins. Co.,* 95 Iowa, 31.

*J. B. Stirling,* attorney-general, on the same side.

The state insurance department must exercise proper supervision in order to know whether the public interest is being safeguarded, and the appellee in the present instance defends, first, on the ground that he was not engaged in an insurance business, and secondly, that even if he were engaged in an insurance business it is such as the insurance department has no right to supervise.

Our theory is that the Manufacturing Lumbermen's Underwriters is not authorized to do business in this state, but if it can come in, it must do so by incorporating under Code 1906, chapter 24, or must obtain a certificate, pay the fees, and subject itself to the supervision of the insurance department.

The attention of the court is called to the fact that the legislature of the state of Missouri, the home of the Manufacturing Lumbermen's Underwriters Association, has recently passed a

bill giving such association the right to do business in that state, and that the bill has been recently submitted to the governor for his approval. I submit this as a circumstance to show that even in the state of its domicile, organizations of the character of the one under consideration are not considered as having authority to do business in the absence of legislative enactment.

Policies of insurance are insurance contracts though they are issued by associations in which all the members assume mutual obligations toward one another and agree to contribute toward the indemnity of the others by the payment of assessments, or otherwise. The weight of authority on matters of the construction of the certificates as to beneficiaries, forfeitures and the like treats mutual benefit societies as life insurance companies in the absence of statutes defining them not to be insurance companies, although some of the cases hold that the by-laws and constitution become a part of the contract and thus caused the certificates in some respects to differ from ordinary insurance policies. See *Penn, etc., Insurance Co. v. Bank,* 38 L. R. A. 34, and authorities cited. The reporter there enumerates a great number of aid and benefit societies and shows that the overwhelming authority is that these organizations, though mutual in all respects, and not open to the public generally, are issuing insurance policies, hence would be subject to the supervision of an insurance department having supervision of insurance companies and insurance policies. Of course we have a special statute relative to fraternal organizations and the extent of the supervision that the department shall have over them, but without this special enactment, they would be insurance companies issuing insurance policies and subject to regulations, unless they took out charters under the chapter relative to corporations in the Code of 1906.

Counsel for appellee endeavor to escape the effect of the language of the statutes in regard to insurance associations by

stating that this is an individual liability, and not that of an insurance association. But while the liability assumed by each is individual, it is the association that is issuing the policy. As said in *Hoadley v. Purifoy,* 18 South. 223, "Each underwriter is individually liable for a fixed amount, but not for the whole, or for any part of another underwriter's liability, yet all act together to effect the contract of insurance. In the former respect it is an individual undertaking, which becomes binding by the separate action of all. In the latter respect the policy is also a contract of a company or association." Hence this liability is not that of an association but the policy is issued by the association and it would be liable to supervision under our statutes as an association issuing policies even if the individuals were not prohibited from issuing insurance policies as they are under the statute providing that individuals insuring others are companies.

By Code 1906, § 2563, the legislature defined a contract of insurance indicating that it was a contract by which one party for a consideration promised to indemnify another, and provided further that it shall be unlawful for any company to make any such contract except as authorized under the chapter on insurance, indicating that it proposed to regulate all contracts of insurance, and the contract in the instant case is certainly one of indemnity, or insurance, even if the parties are not doing a general insurance business. The insurance department must regulate the kind of policies issued. Code 1906, §§ 2577, 2590, 2597. The company incorporating under chapter 69 must file with the insurance commissioner the records of the corporation showing its organization, by-laws, etc., and the contract must be in accordance with the by-laws. Code 1906, § 2579. These sections show clearly that it was the object of the legislature to require the insurance commissioner to supervise the policies or contracts of insurance and to regulate the terms thereof and the mutual stipulations therein, and that the

legislature no longer considers contracts of insurance private contracts which the parties may mutually enter into without any regulation by the insurance commissioner.

It has always been the contention of many associations issuing insurance contracts, that such contracts were matters of private agreement with which the state had no concern and over which it could exercise no control, but this contention has not been sustained by the courts and has now been practically abandoned by the associations themselves. The contract of insurance is one thing and the business of insurance is another, and while all may not jointly assume risk, they all participate jointly in the issuance of a policy; and it is unlawful for any such association to issue a policy in this state except as authorized under the provisions of chapter 69, Code 1906. 1 Cooley on Insurance, 25. Persons wishing to purchase such insurance as is issued by the association, or individuals, in the instant case can do so for no one is prohibited from purchasing any kind of insurance he desires to obtain from a foreign company, association, or individual. But such persons, companies, or associations, if they come into the state of Mississippi to solicit business, or send their agents into the state to adjust losses, are subject to the insurance laws of this state and must obtain the license. *Swing v. Brister,* 87 Miss. 516; *Cowan v. London,* 73 Miss. 321; *State v. Ackerman,* 24 L. R. A. 298; *Mutual Fire Ins. Co. v. House,* 89 Tenn. 438.

The insurance department is established to protect the citizens against these hardships, and as well said by the court in *Richards v. Ackerman,* if these individuals, corporations, or associations can do without a legislative authority what they here assume to do, our insurance laws ought to be repealed, for individuals, then, by organizing in this manner could escape both individual and corporate liability beyond the amount of assets they might choose to place in the hands of their trustees as the basis of their liability. The power of the insurance

commissioner to regulate the contracts and the terms thereof carries with it the power to stipulate all the terms of the policy. *Attorney-General v. Insurance Commissioner,* 148 Mich. 566, 112 N. W. 132.

*Boyle & Howell,* for appellee.

A foreign trading corporation, having no office or place of business in the state, but employing a soliciting agent, whose orders are sent to the home office where they are filled by shipment direct to the purchaser, is not "doing business" within the state, within laws 1894, page 49, I. c. 61, regulating the service of process against foreign corporations. A mere soliciting agent employed by a foreign corporation which is not "doing business" in the state is not an agent of the corporation, within laws 1894, page 49, c. 61, providing that process may be served on an agent of the corporation; the term "agent," as used in the statute, meaning only an agent vested with some general authority and discretion, and not a mere employe. *Saxony Mills v. Wagner & Co.,* 94 Miss. 233, 47 South. 899.

The doing of an insurance business comprehends an engagement in that business for profit. Those engaged in the insurance business are so engaged for a livelihood. It is the thing out of which they make their living. They sell insurance to the public for a profit. The ordinary citizen has no knowledge of the solvency or integrity of these companies that offer insurance to the public for a profit; hence state regulations. An entirely different situation is presented when we come to consider the plan under review. The manufacturing lumbermen are not engaged in the insurance business. Their business is to manufacture lumber. They enter into contractural relations with each other for the purpose of indemnifying themselves against loss by fire. It will be conceded that if the property of two manufacturers joined each other that a fire wall could be erected between their property and maintained at the

cost of each.　No one will contend that they would be engaged in the business of erecting fire walls or buildings, etc., and yet this private contract of indemnity that they enter into, whether they seek to indemnify each other against loss is but the exercise of the same caution as would be shown in the erection of a fire wall.

Inter-insurance is not written for a profit.　It is written solely for protection.　It might be of some intereest to call attention to the fact that inter-insurance is the oldest form of insurance known.　It had its origin in the maritine law, as it developed among the ancient Rhodians.　By this law if either ship, freight, or cargo was sacrificed to save the others all had to contribute their proportionate share of the loss.　This division of loss naturally suggested a division of risk; first among those engaged in the same enterprise, and, next, among associations of ship owners and ship merchants.　16 Am. & Eng. Ency. of Law, 839.

A very clear English case is in point: Parliament by its charter had given a monopoly to two public insurance companies.　A number of ship owners undertook to underwrite each other and the charge was made that they were thereby invading the special privilege of the monopoly granted by Parliament.　Lord Kenyon delivered the opinion, saying: "The plaintiff and the defendant were members of the Whitly association, consisting of a number of persons, owners of ships, each of whom, in proportion to his shipping, paid a certain sum which formed the stock of the society.　The policies were signed by all of the members, but all insured for each other according to the respective value of their ships and when any loss occurred the treasurer paid it out of the joint stock.　The defendant's share was fourteen pounds.　Each individual was only liable for the sum he had undertaken."　Erskine, for the defendant objected, on the ground that the policies were void in law.　This objection was overruled, Lord Kenyon saying:

"This does not infringe on the act of parliament, as the members of the association have only underwritten in their individual characters. But they cannot underwrite for themselves and partners. If all of them were liable up to the extent of their whole stock it would be illegal. At present the members of this association only stand as individual underwriters for small sums." *Lee v. Smith,* 7 D. & E. Rep. 189.

Counsel states that under the plan discussed the public is not concerned. Then if the public is not concerned wherein has the state the authority to exercise its police power? The state admits that it is not an association, a company, or a corporation. Then under what section of the statute can there be a conviction?

For the sake of argument admit that those exchanging contracts of indemnity are engaged in the insurance business. Wherein does the statute of Mississippi provide for the regulation of such plan or scheme? As we have heretofore urged, unless the statute covers the plan the superintendent is without power. Pennsylvania, Illinois, Florida, Georgia, and Indiana have statutes regulating the business of insurance. The statutes of each state differ in some particulars from each other and all may differ in certain respects from the statute of Mississippi, but the object of the statutes of each state is the regulation of the business of insurance. The question has been passed on by the supreme court of each of the five states named, holding that where the statute does not cover the particular form in which insurance business is conducted the superintendent is without authority. These cases are instructive, as they go into the very purpose of insurance regulations and point out that in the exercise of the police power the state limits its exercise by the scope of the statute. *Hoadley v. Insurance Commissioner,* 37 Fla. 564; *State v. Campbell,* 17 Ind. App. 443; *Barnes v. People,* 168 Ill. 425; *Fort v. Georgia,* 23 L. R. A. 86; *Commonwealth v. Reinhol,* 163 Pa. St. 287.

Opposing counsel refer to *State v. Stone*, 118 Mo. 388, and *State ex rel. Richards, Attorney-General v. Ackerman*, 24 L. R. A. 298. Stone represented a Lloyd organization doing business in Missouri for a profit, and the supreme court of Missouri held that the Missouri statutes were broad enough to cover the business of insurance as operated by a Lloyd association. In the *Ackerman case, supra,* we have a Lloyd association. The supreme court of Ohio in that case held that the Lloyd association was exercising all the functions of a corporation and the case was brought within the statutes of Ohio, on the theory that as it was exercising corporate functions in fact the mere form of the association did not save it from state regulation.

A case that throws light on the question of the limitation of state statutes is *Louisville, etc., Association v. Commonwealth,* 9 Bush, 398. In this case it developed that contracts were exchanged between members of the association, the performance of which were secured by a pledge of property of each member to the extent of his own insurance. One-half of one per cent entrance fee was paid by each member in cash for expenses. The laws of Kentucky provide for the incorporation and regulation of fire and marine companies. It was held in this case that such an association was not engaged in the insurance business and did not come within the scope of the statute.

If it be held that the statutes of Mississippi are broad enough to cover the plan under review, then we contend that such an exercise of the police power is violative of the constitutional rights of those who exchange these private contracts. Broad as is the police power of our legislature it is not unlimited. *State v. Trower,* 185 Mo. 29. The right to make contracts is inherent and inalienable. Any attempt to unreasonably abridge it is unconstitutional. *Ritchie v. People,* 115 Ill. 98. The only freedom which deserves the name is that of pursuing our own good way in our own way, so long as we do not

attempt to deprive others or impede others in their efforts to obtain it.    John Stuart Mill on "Liberty."

Every man of full age and sound mind is at liberty to make contracts and if made on good consideration and without fraud, he must be bound by them unless by statutory provision he is disabled.    And disabling statutes of that nature should be strictly construed, for, although founded on policy and a just regard to the public welfare, they are in derogation of private rights.    *Marriner v. Roper,* 112 N. C. 164; *Smith v. Spooner,* 3 Pickering, 229.

Individual freedom to make contracts is protected by that clause of the 14th amendment to the United States Constitution which declares that no state shall deprive any person of life, liberty, or property without due process of law.

The right to acquire, possess, and protect property includes the right to make reasonable contracts, which shall be under the protection of the law.    *Leep v. Railway Company,* 58 Ark. 407, 415; *People v. Coler,* 52 L. R. A. 815, 821.

What right is more essential in the protection of property than the right to seek indemnity against loss by fire?    But is the owner of property to be driven to insure with those who are engaged in the insurance business and thereby pay exorbitant and excessive prices?    Why has he not the inherent right to protect his property, if he wishes to, by entering into a reciprocal contract with his neighbor whereby each agrees to indemnify the other against loss by fire.    *Palmer & Crawford v. Tingle,* 66 Ohio St. Rep. 423; *Ex parte Garland,* 71 U. S. 4; *State v. Loomis,* 115 Mo. 307; *Star Publishing Co. v. Associated Press* (Mo.) 51 L. R. A. 151.

Contracts of insurance are neither *mala prohibita* nor *mala in se,* and, where entered into by persons *sui juris,* are to be regulated and determined by the same rules that govern ordinary agreement, with neither more nor less favor than is shown in other cases.    *Co-Operative Assn. v. Leflore,* 53 Miss. 1.

It is suggested by opposing counsel that a number of the subscribers are corporations and that by entering into this contract they violated their charters. This indeed is a strange argument to make in this case, for wherein could that argument apply to the appellee's guilt or innocence? The question is disposed of, however, by the suggestion that one cannot raise the question of *ultra vires* in this collateral way. *Railroad v. News Co.,* 151 Mo. 373; *Cass County v. Insurance Co.,* 186 Mo. 1; *Bank v. Bank,* 10 Mo. 123; *Logan v. McElroy,* 98 Mo. 349; *Snow v. Branch,* 122 Mo. App. 226; *Bank v. Hunt,* 7 Mo. App. 42; *Drug Co. v. Robinson,* 81 Mo. 18; *Insurance Co. v. Smith,* 117 Mo. 261; *Walsh v. Brewing Co.,* 47 Mo. App. 608; *Glass v. Brewing Co.,* 47 Mo. App. 639; *Receiver v. Mayor,* 66 N. J. L. 362, 49 Atl. Rep. 465.

It will be conceded that a corporation engaged in the lumber business has the right to buy a policy from an old line insurance company. Now, in buying a policy of insurance from an old line company it is not doing an act that relates to its lumber business as such, but it is doing an act incident to its lumber business, to wit: the protection of its property. If it has a right to buy a policy from an old line company wherein has it not the right to accomplish the same purpose by making a contract with another corporation engaged in the lumber business?

One of the stock arguments used against inter-insurance is that the contracting parties pay no fee, whereas, old line companies pay license fees. In the light of the agreed statement of facts a man would have to be forced to extremes to make that argument in the case at bar. If the citizens of Mississippi by carrying their own insurance can save hundreds of thousands of dollars yearly, that money stays in Mississippi, and when taxes are paid to the state the few paltry dollars that insurance companies turn into the state treasury by way of fees would be insignificant as compared to the sums that property owners would pay on values that would be saved by reason

of carrying their own insurance. Not only do the citizens pay taxes upon their savings, but the money remains in the state and is not poured into the coffers of foreign institutions.

Foreign companies carry no reserve in Mississippi, and the citizens of this state are practically left helpless touching the solvency of the public companies. Infinitely more certain is the guaranty secured by these private contracts, for every contracting party, as shown by the agreed statement, is familiar with the business integrity and financial standing of those with whom he enters into contractional relation.

In the court below it was decided that the appellee was not guilty on the merits of the whole controversy and the court did not discharge him on the defective complaint under which he was being tried. Without waiving the point that the complaint is defective, we hope that this appellate court will decide the case on the merits of the important issues involved. Counsel for appellant cite *Fyke v. State,* 87 Miss. 251. In this case the right of the state to regulate the subject of insurance was discussed. Fyke represented a foreign company, organized under the laws of another state, and came into Mississippi soliciting business. He was arrested because he was soliciting without a license. The defense made was that health insurance was not covered by the Mississippi statutes and the court properly held that it was covered, not only under the general plan and scheme of law, but specifically covered by section 2582 which provides, among other things: "Companies so formed issuing health policies," etc. The court in that case condemns "wild cat" companies organized for the sole purpose of defrauding the unwary. In what way can that decision assist the state in the light of the agreed statement of facts before us? It is shown here that only men of the highest business integrity enter into the contractural relations. Each knows the other's business standard and his ability to respond under his contract.

When the city of Baltimore was overwhelmed by its great fire and the city of San Francisco was leveled to the dust by earthquake and fire, the old line companies failed to respond to their obligations, many of them going into bankruptcy, others settling for fifteen and twenty per cent on the dollar. Inter-insurance, however, stood the test and met its obligations dollar for dollar. The reason why this was so is apparent when one comprehends and grasps the plan. Only those who are financially responsible, enter into the contract and careful investigation is made as to the moral hazard, hence when the loss occurs there is not only ability to pay, but the disposition to respond. Inter-insurance is carried largely by the great department stores in cities, also by jobbing houses, and, as above suggested, these private contracts proved an inestimable boon to those carrying them in Baltimore and San Francisco.

It is shown by the agreed statement of facts that in ten years there have been saved to the manufacturing lumbermen over seven hundred thousand dollars by carrying their own insurance. Wherein does public policy demand the abrogation of this plan? Opposing counsel say that notwithstanding the fact that the law may not apply, still, the appellee is guilty, and, of course, if this is true this plan of exchanging contracts must cease. It is a well known fact that every insurance company carries what is known as a prohibited list. That is to say, certain companies will not insure a certain class of risks, as, for instance, a plant manufacturing mattresses, etc. Is it conceivable that the state will urge that notwithstanding the fact that insurance companies may refuse to write a certain class of property, the citizen is thereby left defenseless; is prohibited from protecting himself by entering into a private agreement with others similarly situated? Is it not plain that society would be benefited by the mutual helpfulness of the plan under review? Bring the matter closely home to this case: We all know that there is great danger of fire in plants that manufac-

ture lumber. In Mississippi there are a great number of plants having an investment of hundreds of thousands of dollars. Assume, for the sake of argument, that public companies should adopt the policy of not carrying this class of risks. The logic of the state's position is to the effect that even in such an event the manufacturers could not protect each other. Would not a policy of that kind be destructive to one of the greatest enterprises of the state? Capital would be discouraged and the industry would wither and decay. Public companies do insure these plants, but the rates charged are in many instances prohibitive. The principle involved in either instance is the same. Is there no relief for this great industry under such conditions? Monopoly is abhorrent to the law and yet the logical outcome of the state's proposition in this case is to drive every man who wants insurance into the arms of the old line companies. *Wilby v. State,* 47 South. 465.

*Green & Green,* on the same side.

An insurance contract is not essentially different from any other contract. *Association v. Leflore,* 53 Miss. 1. It becomes subject to the police power only in so far as the public is affected. *Fikes v. State,* 87 Miss. 257.

All statutes in derogation of the common law and limiting the rights of citizens must be strictly construed, and statutes enacted in pursuance of the police power are subject to review by this court to ascertain whether the object sought is within the police power of the state, and if within such power, then that the means adopted to ascertain the fact are properly measured therefor. *Ex parte Drexel,* 147 Cal. (1905) 766; *Mugler v. Kansas,* 123 U. S. 661; *Steel Co. v. State,* 66 N. E. (1903) 1007.

As determined by the supreme court of the United States in *Allegeyer v. Louisiana,* 41 Law. Ed. U. S. S. C. Reports, 836, the right to make an insurance contract is part of the civil lib-

erty of a citizen which can be regulated only upon condition that the exercise thereof impairs the public welfare. Thus being a constitutional right we submit: (1) the legislature did not attempt to prohibit the business here done; (2) but if it did, such prohibition violated the United States Constitution by depriving the persons of their liberty and property without due process of law and by denying them the equal protection of the law. *Munn v. Illinois,* 24 Law. Ed., U. S. S. C. Reports, 77.

The statute law in question has no application to any inter-insurance relation. The state insurance department was created by the act of March 5, 1902, and by its caption the act was entitled, "An act to establish a separate and distinct department of insurance, to create the office of insurance commissioner, and to regulate insurance companies and fraternal orders doing an insurance business in this state, and to provide for the investigation of incendiary fires." While the caption may not be conclusive in judicial construction, still we have here a declaration that the subject of the act was to regulate insurance companies doing an insurance business and it is apparent that such regulation was not to be of concerns other than insurance companies and fraternal orders, each of which is distinct, separate and apart from lumber companies, druggists, wholesalers and other persons interested in inter-insurance. The regulation was not to be coextensive with the insurance relation but was strictly limited by the act to a particular class, and to that class only, when doing a particular thing, that is, an insurance business in this state. Inter-insurance was well known at the date of the passage of this act and its beneficent operations appreciated. *Louisville Assn v. Commonwealth,* 9 Bush (Ky.), 394; *Corey v. Sherman,* 96 Iowa, 124; *State v. Iowa, etc., Assn.,* 59 Iowa, 133; *In re Assignment Mutual, etc., Ins. Co.,* 107 Iowa, 146; *State v. Mutual, etc., Assn.,* 59 Iowa, 131; *Bank v. Archer,* 8 S. Med. & M. 151; *Ellison v. Railroad,* 7 George, 572; *Farmers, etc., Ins. Co. v. Cole,* 90 Miss. 515; *Lochner v. New*

*York,* 198 U. S. 56; *Packing Co. v. Bay,* 200 U. S. 185; *Harper v. California,* 155 U. S. 662; *Powell v. Pennsylvania,* 127 U. S. 678, 684; *Butchers' Union v. Crescent City Co.,* 111 U. S. 746; *State v. Marcus,* 185 N. Y. 257; *People v. Williams,* 100 N. Y. S. 337; *State v. Julow,* 31 S. W. 782; *People v. Otis,* 90 N. Y. 48; *Slate v. Loomis,* 115 Mo. 307, 22 S. W. 350; *Com. v. Perry,* 155 Mass. 117, 28 N. E. 1126; *Godcharles v. Wigeman,* 113 Pa. St. 431, 6 Atl. 354; *State v. Jacobs,* 98 N. Y. 98; *People v. Gillson,* 109 N. Y. 389; *Millett v. People,* 117 Ill. 294, 7 N. E. 631; *Ritchie v. People,* 40 N. E. 454.

Argued orally by *Fred M. West* and *J. B. Stirling,* attorney-general, for appellant, and by *L. C. Boyle* and *Garner W. Green,* for appellee.

MAYES, J., delivered the opinion of the court.

The facts of this case need no restatement, since counsel have entered into a written agreement fully covering same and filed it of record. The consideration of the case is not an involved or difficult task, since every feature of it lies wholly within our statutes regulating insurance, being chapter 69, p. 766, of the Code of 1906.

The first section bearing upon the question here presented is section 2606, which prohibits any foreign insurance, indemnity, or guaranty company from doing business in the state until it shall have complied with its provisions in the following ways; that is to say: By depositing with the commissioner of insurance, first, a certified copy of its charter, etc., and a statement of its financial condition, etc., and paid the fees therefor; second, by satisfying the commissioner that it is fully and legally organized under the laws of its state to do the business it proposes to transact, etc., that it possesses net cash assets of not less than $100,000, or net cash assets of not less than $50,000, with also invested assets of not less than $100,000, and in each case with additional contingent assets of not less than $300,000,

etc.; third, it shall constitute and appoint the commissioner of insurance, etc., its true and lawful attorney, upon whom all process may be served as if upon the company, etc.; fourth, it shall also appoint as its agent in this state some resident other than the commissioner of insurance, on whom service can be had as effectively as upôn the company itself; fifth, it shall have the commissioner certify that it has complied with all the above provisions of the. law. The facts conclusively show that the above requirements were not complied with by the Manufacturing Lumbermen's Underwriters, though its domicile is indisputably in Kansas City, Mo.

The whole contention on the part of appellee is that, under the plan used by the Manufacturing Lumbermen's Underwriters for effecting insurance on the property of manufacturing lumbermen, it neither does an insurance business in the sense of the statute, nor does the statute in any way apply to any business carried on by it. It is further the contention that the Manufacturing Lumbermen's Underwriters is in no sense an "insurance company, corporation, partnership, association, or individuals" transacting the business of insurance in this state within the meaning of section 2559 of the Code. While counsel representing the Manufacturing Lumbermen's Underwriters, carefully refrain from referring to it as an association, never using the word one time in all the agreed record or in their brief, we shall hereafter designate it as such, for such in truth it is. We may here say that the determining feature as to the application of the insurance law to the organization whose plan of insurance is now under review lies, not in the name by which it is called, but in the business conducted by it. Though the organization be not called by any of the names specified in the statute, such as "company, corporation, association," etc., if in truth it is such, and is doing the business which makes it subject to our statutes on insurance, the absence of the name can operate as no charm wherewith to wrest it out of the control of the in-

surance department. If the contention of this association is sound, we have an association domiciled in Kansas City, effecting large and important insurance risks in this state, and attempting to absorb the whole of the character of insurance done by it, without actual capital other than the premiums paid in by those taking membership in same, and twenty-five per cent. of this, under the subscriber's agreement, is payable for attorney's fees and expenses. Further than this, in case it becomes necessary for an insurer to sue, there is no authorized person in this state to accept service of summons; in fact, the plan of this association runs counter to both the statute itself and all the purposes had in view when it was enacted. The object of the statute is to prevent any but capitalized and responsible foreign insurance companies from doing business in this state, insurance companies that can be made responsible on their contracts and in the jurisdictions where those contracts are made; and yet this association violates every intent of the statute and claims exemption therefrom on the phraseology, merely, of a scheme of great complexity, but which at last is nothing but insurance.

Section 2559 specifies the concerns subject to the insurance laws, which are "all companies, corporations, partnerships, associations, individuals and fraternal orders, whether domestic or foreign." It would be impossible for the statute to more clearly indicate a purpose to include within its provisions all organizations doing an insurance business of any kind. This section includes every possible character of association or organization in that business. The use of the word "company" in section 2606, prohibiting any "foreign insurance company" from doing business in this state until, etc., is defined in section 2562 to mean "all corporations, associations, partnerships, or individuals," etc., thus again showing that the provisions of the statute apply to insurance associations in the broadest possible way. Section 2563 provides what shall be a contract of insurance

within the meaning of the statute; that is to say, it is "an agree-
ment by which one party for a consideration promises to pay
money or its equivalent or to do some act of value to the as-
sured, upon the destruction, loss or injury of something in which
the assured or other party has an interest." The policy under
consideration in this case is a policy of insurance in favor of
the Cotton States Lumber Company for the sum of $3,000, on
property aggregating in value $8,000. It is an insurance con-
tract falling literally within the definition of section 2563. The
insurance contract is made by the Manufacturing Lumbermen's
Underwriters' Association, which is "a party" within the mean-
ing of the above statute. In volume 6, p. 5202, of Words and
Phrases, the word "party" is held to mean "as naturally a body
composed of several individuals as a body sole and individ-
ually," and we have no hesitancy in holding that the association
in question, as such, is a "party" within the meaning of the
statute. " 'Party' everywhere implies unity, but is properly
used to signify a unit composed of many, as well as an indi-
vidual." See above citation. The association is composed of
a number of persons, firms, individuals, corporations, or asso-
ciations who have become members of the underwriters' asso-
ciation by becoming subscribers thereto, through the agency of
the power of attorney executed to Harry Rankin & Co. The
only thing peculiar about this insurance association is the com-
plication of its plan, designed only for the purpose of escaping
the insurance laws. We have nothing to do with the motive
behind the plan. It may be true, and doubtless is true, that
all the promptings of this plan of insurance were worthy; but
it falls within the condemnation of the statute. The rule of
law applies alike to the worthy and the unworthy, to the end
that the unworthy may not get in control of the business. To
hold that a plan of insurance like this was above the broad terms
of our statute would be to do violence to its plain purpose and
open the door wide to all kinds of fraudulent insurance schemes.

The question of whether or not the association is doing an insurance business, within the meaning of the statute, is not affected by the fact that the association confines itself to the insurance of only a particular kind of property. If this were not true, all subjects of insurance might be covered under a similar plan and by the same association, merely by having the association formulate the same plan, with the same attorney in fact, having a branch dealing only with insurance on dwellings, then again another branch dealing with insurance on stocks of goods, then again another branch dealing with insurance on storehouses, and so on until it might absorb any and all subjects of insurance and thus repeal the whole insurance law. This construction of the statute does no violence to the constitutional rights of any person, whether it be a right asserted under the federal or state constitution., The right of a state to regulate the business of insurance is so well settled that it needs no citation of authority. Indeed, counsel for the association opens the argument with the statement that: "Counsel for the state devote considerable space to the right of the state to regulate the business of insurance. It is unnecessary to cite authorities on this point. We believe that the state has the unquestioned right to regulate the business of insurance." But it is claimed by counsel for the association that, if it be held by this court that the statute is broad enough to cover the plan under review, then the statute is unconstitutional, because it invades the right of private contract. This contention is not sound. The question in this case is whether or not this association is doing "an insurance business" in this state within the meaning of the statutes. There is no question in the case as to the right of any individual to make a contract with the association. The main question here to be considered is whether mere language may be so manipulated as to formulate an adroit plan for the operation of an insurance business in this state in violation of its laws. We say not. It plainly appears that the association

is doing an insurance business, and that it has not complied with the insurance laws. The business is therefore declared unlawful, and the association is conducting its business without authority.

The principle declared here is but the reannouncement of what was well said by this court in the case of *Fikes v. State,* 87 Miss. 251, 39 South. 783. In the case just cited the court said: "The law referred to was a timely and wise effort by the legislature to protect the people of the state against imposition and fraud on the part of any insurance company, no matter what form the particular scheme might assume. The intent of that law was that all insurance companies, whether fire, marine, accident, or fraternal, or other kind, should be subjected to an examination by the insurance commissioner before they could legally write insurance in this state. It imposes certain restrictions on every insurance company desiring to do business in this state, and demands compliance with certain conditions and the payment of certain fees before it can receive a license from the proper authority. The statute also contemplates that no agent shall represent any character of insurance company unless the same has been lawfully permitted to do business in the state and such agent has himself received a certificate entitling him to solicit and write insurance. This beneficial legislation was found necessary in order to insure the people protection from the imposition and fraud of so-called insurance companies not organized in accordance with law, not financially responsible for losses in case such should occur, and being in truth simply traps for the unwary, operated mainly, if not solely, for the benefit of the officials and soliciting agents. The inhibition against the unlicensed transactions of insurance business was wisely couched in general terms, and that inhibition applies to all insurance companies, without regard to mere formal differences occurring in their routine of business or in the promised benefits. The intention of the legislature was not to incite or

encourage the conniving to devise different kinds of insurance
associations, simply varying in some particular from the gen-
erally recognized organizations, but was an attempt to absolutely
prevent dishonest, fraudulent, or insolvent associations transact-
ing business in this state. The terms of the statute expressly
include 'all corporations, associations, partnerships, or individ-
uals engaged as principals in the business of insurance.' Hence
a permit and license is demanded of all insurance associations,
without exception, and such permit can only be obtained by
complete compliance with all the provisions of the statute; one
of the chief conditions being that the state insurance commis-
sioner must be fully satisfied of the applying company's 'finan-
cial condition and ability to fulfill its obligations.' "

Statutes of the character under discussion should be liberally
construed, in order to bring within their provisions and remedial
purpose all associations organized for the purpose of conducting
the insurance business, however complex and obscure may be the
plan attempted through which to carry on that business. We
are prepared to say, under the comprehensive language used in
our statute, that no plan of insurance can be originated whereby
that business can be conducted without compliance with our
laws. The discussion in this case has taken a very wide range,
but the case itself has its beginning and ending in the terms of
our statute. The plan itself, bared of all its confusing com-
plexities and stripped of all its veiling, is nothing more or less
than a foreign insurance association, without capital of its own,
and making its profits out of the premiums paid by its sub-
scribers, conducting the business of ordinary insurance on a
particular class of property, doubtless selected by the association
as being the most remunerative to it. It is not important for
us to declare what kind of an insurance association this is.
Suffice it to say that it is an insurance association more nearly
falling under the classification of a "mixed company" or as-
sociation, in that it possesses some of the features incident to

both a "stock company" and a "mutual company," but being neither. *State v. Willett,* 171 Ind. 296, 86 N. E. 68. We have found no decided case exactly in point. In truth, this contract seems to be the first of its kind ever reviewed by any court. The manifest purpose of this contract is to create an association for the purpose of doing ordinary insurance business, and at the same time raising the association engaged in the business above and out of the reach of the insurance law of this state, by a plan of operation that is masterful in its evasion of all heretofore decided cases, but which falls to pieces when interpreted in the light of the broad provisions of our statute, giving to them only a common-sense interpretation.

In the brief of counsel representing the underwriters it is insisted that it can never be held that the underwriters are conducting the business of insurance, for the reason that there is no element of profit arising therefrom to the subscribers to same. Counsel say: "The parties to the contract do not enter into the relation for profit, except as the adage has it: 'A penny saved is a penny made.'" The construction which counsel representing the underwriters place upon this contract is not its true construction, and in reaching their conclusions they overlook important results accomplished by the contract in so far as its originators and officers are concerned. It is quite true that the only object that the subscriber has in joining this association and taking out insurance is to effect cheap insurance. That may be said to be the only profit accruing to the subscriber. But the same may be said on the part of any insurer who undertakes to get insured in any cheap, but irresponsible, company. The object of the state's police power was to make insurance safe, as well as cheap. The design of the statute is to protect the citizens of the state against their own improvidence in insuring with irresponsible concerns. But, while it is true that the object of the subscriber is merely to get cheap insurance, the whole scheme shows that the subscriber is at last a mere figure-

head in this plan of insurance, when it comes to control and management of the association. Stripped of all its disguise, the Manufacturing Lumbermen's Underwriters' Association is nothing more nor less than an insurance association, conducted by Harry Rankin & Co. in Kansas City, Mo., having no capital stock and unauthorized to do business in this state in any way. Harry Rankin & Co., in effect, the association, receive their profit by deducting twenty-five per cent. of all premiums paid by the subscribers to effect insurance with the association. In a more complicated form, this association is in effect nothing but an insurance association organized for the purpose of profit to its originators, and they do receive a handsome profit, and, in reality, constitute the association itself.

In the case of *Farmers' Ins., etc., Co. v. Cole,* 90 Miss. 508, 43 South. 949, no question was presented save that of whether or not a domestic mutual insurance company, chartered under section 897 of the Code, could force the insurance commissioner to issue the certificate of authority to do business in this state. It was shown in that case that the insurance company, though domestic, and not foreign, had no capital stock, and this court merely held that the insurance commissioner could not be made to issue the certificate of authority. The question of whether it could conduct the business of insurance independently of this certificate and in violation of section 2582, requiring that all companies organized "for the purpose of transacting life or fire insurances," etc., "shall have a capital of not less than fifty thousand dollars," was not involved, and was not decided. Whatever may be the law in regard to domestic mutual insurance companies, it is clear to us that the "Underwriters" is but a foreign insurance association, and was carrying on the business of insurance in contravention of our statutes.

The court should not have ordered the discharge of the appellee, and in doing so it committed error.     *Reversed.*

WHITFIELD, C. J., delivered the following dissenting opinion:

This case cannot be clearly comprehended, except by a careful study of the agreed state of facts. That agreed statement is too long for insertion in this opinion, but the reporter is hereby requested to set it out in full in his statement of this case.

The statute is as follows: "Every person who solicits insurance on behalf of any insurance company, or takes or transmits other than for himself, an application for insurance, or a policy of insurance, to or from such company, or who advertises or otherwise gives notice that he will receive or transmit the same, or who shall receive or deliver a policy of insurance of any such company, or who shall examine or inspect any risk, or receive, collect or transmit any premium of insurance, or make or forward any diagram of any building, or do or perform any other act or thing in the making or consummation of any contract of insurance for or with any such insurance company other than for himself, or who shall examine into or adjust, or aid in adjusting any loss for or on behalf of any such insurance company whether any of such acts shall be done at the instance or request or by the employment of the insurance company, or of or by any broker or other person, shall be held to be the agent of the company for which the act is done, or the risk is taken, as to all the duties and liabilities imposed by law, whatever conditions. or stipulations may be contained in the policy or contract." Code, § 2615.

The plan under which these lumber plants operated was this, as shown by the agreed case: A number of lumber mill owners conclude that they can carry their own insurance at less cost than they can purchase it from public companies, and at the same time secure better and more certain indemnity. To accomplish this end, the mill owners enter into a private contract.

whereby each agrees to indemnify the other in proportion as he receives indemnity. In the event of fire loss, each contributes his pro rata share, and this contribution is based on the indemnity that the one who suffers loss has agreed to indemnify each of the other contracting parties. If, at the expiration of the contract, no loss has occurred, the cost of carrying the insurance is nothing. The parties to the contract do not enter into the relation for profit. No person gets anything except Harry Rankin & Company, which receives a certain salary for the services it renders. The contract of indemnity is a mere incident of the business, the lumber business, and an arrangement whereby they seek to secure themselves against a contingency of fire loss. No insurance is sold to the public, only lumbermen entering into the contracts, and only such of them as each of the contracting parties agrees to permit to enter. To be a little more specific, all these various lumber plants constitute Harry Rankin & Company their agent and attorney in fact, as a matter of convenience in practical administration of the business, to attend to this inter-insurance. That company receives, not by way of profit, but by way of salary for services actually rendered, a certain per cent. of the moneys paid in.

(a) No contracts of insurance are written for the public. No person can participate in the benefits of inter-insurance except he be known to and accepted by all the others occupying the relation.

(b) In inter-insurance there is not, and cannot be, any profit. By its very nature it eliminates all possibility of profits, and hence there is withdrawn from it the very element which is seized upon by the legislature in prescribing the legal reserve for old-line companies.

(c) This inter-insurance exists between those in the same business similarly situated, personally acquainted, and whose financial responsibility is not only well known, but made immaterial by reason of the premium deposit.

96 Miss.—49

(d) The object is protection, not making money out of the insurance business, as such. The apportionment of loss accurately admeasured by actual considerations, without payment of any profit.

(e) By this inter-insurance, protection only is guaranteed in its simplest form, each party being interested to the same extent and in the same manner as is every other party. And this premium deposit, paid by each, does not go into the treasury of any corporation or association, or individual doing the business of insurance, but remains the property of the persons making the premium deposit, who can withdraw at will, and withdraw his premium deposit, except the part of it that has already been earned in paying expenses, etc.

Let the following facts, deduced by learned counsel for appellee from the agreed statement of facts, be distinctly noted, that the exact case in hand may be clearly comprehended: I give them in counsel's language:

"First. Contracts are exchanged wholly between lumber manufacturers, and the contracts are entered into by such manufacturers as are agreeable to all those who enter into these relations.

"Second. Owing to the number who enter into this contractual relation, it is inconvenient for each to attend to the necessary details pertaining to the contract; that is, in the event of a loss it would be inconvenient for each of the contracting parties to inspect the loss for the purpose of ascertaining the amount due. In order, therefore, to simplify the plan, each contracting party appoints a common agent, giving this agent a power of attorney authorizing him to do those things that the principal might have done for himself. It is understood that each contracting party appoints this common agent by a separate power of attorney. These powers of attorney are to the same effect and purpose.

"Third. For convenience the term 'subscriber' is used. This term simply indicates a contracting firm or individual.

"Fourth. A voluntary advisory committee is selected from among the 'subscribers.' This committee serves without pay and co-operates with the attorney in carrying out the terms and purposes of the contracts.

"Fifth. The plan could very well be operated by advising each 'subscriber,' in the event of a loss, of the amount due from him under his contract. To do this, however, would involve an enormous amount of detail work. In order, therefore, to simplify and promote prompt settlement, it is agreed that upon entering into this relation the 'subscriber' deposits with the attorney in fact a sum of money. This deposit is placed to the individual credit of the subscriber. There is no joint fund. As a means of arriving at a basis for a uniform and equitable deposit, the plan has been adopted of calling the deposit a 'premium,' and the premium is based upon the rating sheets of old-line companies. There should be no confusion as to the purpose of this so-called premium deposit. It is not a premium in the sense that the term is used by old-line companies. It is but a term of convenience that is used to describe the amount of money that each subscriber deposits, and which is placed to the credit of the subscriber. This money remains the money of the subscriber, which can be withdrawn at any time he sees fit to sever his contractual relations, and, as above suggested, this plan of deposit could be entirely abrogated and the general scheme go forward. As stated, these deposits are made so that in the event of loss the attorney has in his hands funds from which the prompt payment of losses can be made, and when a loss does occur the account of each subscriber is charged with his pro rata share. A credit and debit account is kept for each subscriber.

"Sixth. One of the subscribers acts as treasurer, and these premium deposits are held by him in trust for all the subscribers separately. Indemnity bonds are executed by the treasurer and attorney in fact, which bonds run to the subscribers.

"Seventh. During the ten years that this plan has been in operation among manufacturing lumbermen there has been saved to the lumbermen over $700,000; that is, by carrying their own insurance, they have been enabled to save this enormous sum of money, over and above that which they would have been compelled to pay old-line companies. In addition to this saving it is proper to suggest that payments are made promptly, and there has never been a liability denied. One can readily understand why this is so. These manufacturers know each other, and only those who have business integrity enter into this contractual relation. Therefore, when a loss occurs among such men, there is no disposition to quibble and delay. In the light of this agreed statement of facts, showing such a beneficent condition, is it not-pertinent to inquire: Why should the state desire to take from these men the opportunity of making this saving, and also the avoidance of vexatious litigation with old-line companies?

"Eighth. The purpose of the plan, as shown by the agreed statement, is for each subscriber to keep on deposit a substantial sum, and this is done for the convenience of all. There is annually returned to the subscriber the unused portion of the premium deposit, with the exception of the balance that is kept on hand, as above stated.

"Ninth. The attorney in fact is paid a salary for his services. In order that each subscriber may contribute to this expense in a uniform and equitable way, it is arranged that the attorney be allowed a certain per cent. of the deposits made, as above outlined. From this per centum is paid also his office expenses.

"Tenth. There are no by-laws, no joint funds, no capital stock, no organization.

"Eleventh. The contract entered into has, among other of its provisions, the following clause: 'The undersigned persons, firms, and corporations, known as "Subscribers to Manufacturing Lumbermen's Underwriters," each person or firm, or cor-

poration acting exclusively for such person or firm, or corporation, and not for any other or others, and each represented under separate power of attorney by Harry Rankin & Company, of Kansas City, county of Jackson, and state of Missouri, and it being understood that, wherever in this policy the word "company" occurs, it means and shall be taken and construed as meaning the persons, firms, or corporations whose names are subscribed to said policy by their said attorneys, and as a part of the contract contained in this policy that each of the subscribers hereto has entered into an agreement with each of the other subscribers to insure property against loss or damage by fire to the several amounts respectively authorized by said agreement, upon the terms and conditions in said agreem nt expressed, which said agreement is hereby made a part of this contract, it being thereby provided that no subscriber shall in any event be made jointly liable with the others, or with any one or any of the others, or otherwise than severally, in consideration of the stipulations herein named and of the payment at the rate of two and 75/100 dollars per annum per hundred dollars premium, does insure the Cotton States Lumber Company for the term of one year from the eighth day of June, 1908, at noon, to the eighth day of June, 1909, at noon, against all direct loss or damage by fire, except as hereinafter provided, to an amount in dollars and cents not exceeding for each subscriber the sum opposite his name on the reverse side hereof, to the following described property, while located and contained as herein described and not elsewhere, to wit.' On the back of the policy, as will be seen by Exhibit B, are set forth the names of each contracting party, and the amount each subscriber agrees to pay the holder of the contract in the event of loss. The language and form of his contract illuminate and make definite the whole contention.

"Twelfth. The phrase 'Manufacturing Lumbermen's Underwriters' is used as a heading to this contract, and it is contended

that this phrase demonstrates that this is an insurance association. 'Manufacturing Lumbermen's Underwriters' is but a phrase used to indicate the place where the contracts are exchanged. 'Manufacturing Lumbermen's Underwriters,' as such, does not insure anybody. The subscriber to 'Manufacturing Lumbermen's Underwriters' underwrites and signs the policy through his attorney, Rankin & Co.

"Thirteenth. Rankin & Co. do not indemnify anybody. Not a dollar of insurance could be collected from Rankin & Co.; but the indemnity is collected solely from subscribers. Insurance is not collected from 'Manufacturing Lumbermen's Underwriters,' but from the subscribers themselves.

"Fourteenth. In order to avoid a multiplicity of suits, it is agreed that a judgment against any one subscriber will be binding upon all the other subscribers. Counsel for state make a point that the citizen would nevertheless be driven to a number of suits to collect this judgment against other subscribers. It is possible that some inconvenience might be suffered if business men were to forget their honor and integrity. But, even so, wherein has the state anything to do with that subject? It is further agreed that service may be had upon Rankin & Co., which will be sufficient service on all subscribers.

"Fifteenth. The power of attorney, marked 'Exhibit A,' evidences that it is given by the subscriber and appoints Rankin & Co. attorney in fact. Rankin & Co.'s authority is limited to the specific things set forth in the power of attorney.

"Sixteenth. The Cotton States Lumber Company, desiring to contract with subscribers, wrote Rankin & Co., asking that some one come to Meehan Junction for the purpose of making an examination of the plant. Mr. Alley, who was in the employ of Rankin & Co., went to Meehan Junction in response to this request from the Cotton States Lumber Company. He made an inspection of the property and sent the report to Rankin & Co. in Kansas City, Mo. The Cotton States Lumber Company

gave Mr. Alley a power of attorney running to Rankin & Co.,
which Mr. Alley sent to Rankin & Co. by United States mail.
Mr. Alley collected no premium, issued no contract to the Cot-
ton States Lumber Company. The sole thing done by Alley
is as above stated."

In short, to sum up, there is no organization of any insurance
company; there are no stockholders; there is no general fund.
Harry Rankin & Company is nothing but a convenient agent
for doing the necessary things to secure these mutual indemnity
contracts. To my mind, this arrangement is nothing on earth
but the exercise of the inalienable right of private contract,
protected by the fourteenth amendment to the Constitution of
the United States, whereby, for mutual protection, these various
lumber plants seek to indemnify each other against loss. It
seems to me to be a very wholesome arrangement. The only
persons who could possibly object to it are the old-line insurance
companies, and it is the premiums which these old-line com-
panies have been exacting from persons who need fire insur-
ance, which has driven different lines of business in the United
States to enter into this sort of private contract for inter-insur-
ance. This is no doing of insurance business, within the
meaning of our statute on that subject. A business is some
vocation which one follows, out of which to make profit—to
make, as we say, his living. The only business done here is
the lumber business. This inter-insurance is a mere incident
of that business. I regard this case as settled thoroughly by
the case of *Farmers' Mutual Fire Insurance Co. v. Cole,* 90
Miss. 508, 43 South. 949. The learned counsel for appellant
seems to regard this case squarely against him, and it certainly
is, if I understand what we held in that case. This court, deal-
ing there with a mutual fire insurance company, without capital
stock, incorporated under chapter 24, Code of 1906, and em-
powered by its charter to insure the property of its members
only, distinctly said: "When the statute speaks of the right to

transact the business of insurance in this state, it means the right to do a general business, and has no reference to the restricted right that a mutual insurance company has to insure the property of its own membership." How, in the face of the sentence just above quoted, it is possible for us to now hold that this inter-insurance of these lumber mills can be placed under the "department of insurance," in the language of the statute, or held to be subject to supervision by the insurance department, passes my comprehension, unless we are to overrule the case just cited. I think that case is perfectly sound, and controls this case.

As aiding this view, the caption of our chapter on insurance is as follows: "An act to establish a separate and distinct department of insurance, to create the office of insurance commissioner, and to regulate insurance companies and fraternal orders doing an insurance business in this state, and to provide for the investigation of incendiary fires." Section 2550 provides: "There is hereby established in this state a separate and distinct department of insurance, which shall be charged with the execution of all laws now in force or which may be enacted hereafter, relative to insurance companies, corporations, associations, or orders placed under this department." And it is added, elsewhere in the chapter: "Nothing in this chapter shall be construed to extend to benevolent associations that only levy an assessment upon their members to create a fund to pay to the family of a deceased member, and make no profit therefrom." Section 2637. This last-quoted provision shows clearly the purpose of the legislature to exclude from state supervision of the insurance department inter-insurance, which provides for no profit. If the whole chapter on the insurance department is carefully analyzed, this intent is plainly apparent throughout. In other words, the legislature recognizes the universal principle that no state insurance department has any right to supervise inter-insurance created by purely private

·contract, without capital stock, without stockholders, without ·organization, without any feature of profit, and created solely for the mutual protection of its members against loss by fire. Right of private contract is a most valuable and sacred right; it is an inalienable right; it is protected by the fourteenth ·amendment to the Constitution of the United States from being in any way interfered with; and to say that any number of lumber plants, or any number of other business concerns of any kind, may not, because of the outrageous extortions practiced by old-line companies, by private contract, agree to interinsure each other, is to deny the right of private contract and to infringe the protection guaranteed by the said fourteenth amendment.

It is argued in a sort of misty fashion, for the appellant, that public policy in some way requires inter-insurance to be subjected to the supervision of the state insurance department. So far as I am able to understand inter-insurance, as manifested by the particular contracts before us in this case, it is a great help to the citizenship of the state, engaged in the business of these lumber mills; a vast saving in the cost of insurance is thereby guaranteed; prompt settlement of losses se·cured, and the demands of these old-line insurance companies, as shown in the recent insurance scandals in New York and ·elsewhere, made impossible. Surely public policy favors this inter-insurance having these objects in view. Those only who have business integrity are allowed to enter this inter-insurance; these private contracts have a guaranty that every contracting party, as shown by the agreed statement, is familiar with the business integrity and financial standing of those with whom he ·enters into the contractual relation. This principle of interinsurance was well understood at the time of the making of these contracts in this case. The supreme courts of other states have passed upon this question, and it has been very ·clearly pointed out in many of them that a state insurance de-

partment is created for the purpose of the regulation of the general business of insurance, as well understood; and they point out that where the statute of a particular state does not cover the particular form in which an insurance business is conducted, the state insurance department has nothing to do with such inter-insurance as this. See *Hoadley v. Insurance Commissioner,* 37 Fla. 564, 20 South. 772, 33 L. R. A. 288; *State v. Campbell,* 17 Ind. App. 443, 46 N. E. 944; *Barnes v. People,* 168 Ill. 425, 48 N. E. 91; *Fort v. Georgia,* 92 Ga. 8, 18 S. E. 14, 23 L. R. A. 86; *Commonwealth v. Reinoehl,* 163 Pa. 287, 29 Atl. 896, 25 L. R. A. 247.

My view of this matter is well expressed in a quotation in the brief of the learned counsel for appellee from Hon. Edward C. Yates, as follows: "The question propounded to me is this: Is a subscriber to a voluntary association, designated as 'Manufacturing Lumbermen's Underwriters,' who exchanges insurance with other subscribers to said concern, binding himself in his individual capacity only, binding himself and not jointly, engaged in the business of insurance within the meaning of the statutes? And if it be further determined that he is so engaged in the business of insurance, is he subject to the control and regulation of the insurance laws of the state? The two propositions shall be discussed in the order stated. I observe in the first place that the subscriber does not exchange insurance for the purpose of profit, or as a means of livelihood; but for the purpose of protecting himself against loss by fire he exchanges with each individual subscriber a proportionate amount of insurance for which such other subscriber becomes liable to him in turn. I think it may be laid down as an indisputable proposition that, if A. and B. both own property of the value of say $2,000, A. may undertake with B. to indemnify him in the sum of $2,000 upon the destruction of his property by fire in consideration of a like undertaking to A. entered into by B., without it being considered that either

one in the transaction indicated is engaged in the business of
insurance. To my mind the Manufacturing Lumbermen's Un-
derwriters is but an elaboration or broadening of this idea. It
can make no possible difference because A. exchanges insurance
with a thousand people instead of one only. Indeed, I think it
must necessarily be deduced from all the authorities that the
state has no more attempted to place an embargo upon the ex-
change of insurance between two individuals than it has to pro-
hibit the exchange of butter and eggs between neighborly house-
wives, nor do I think it could do so; for, if it may not prohibit
the exchange between two individuals, it clearly has no greater
right when more than two are involved in the exchange. If
this be not true, where do we reach the point where the state
may assume powers of regulation, and, if we reach it at all,
why? I know of no state that has attempted to interfere with
the rights exercised by individuals in a similar plan to that
under consideration. It has been followed in the great com-
mercial states for many years, notably New York, Pennsyl-
vania, Illinois, and Missouri, and no question has thus far
been raised with reference thereto."

Not to protract this opinion, I summarize my conclusions
as follows: First, that there is no statute in our state prohibit-
ing this sort of inter-insurance set up in the agreed statement
of facts; second, that in the absence of such statute these par-
ties have a perfect right of private contract, to do the things
they are here doing; third, that the business which these parties
are conducting is a lumber business, and not the general busi-
ness of insurance; fourth, that our state insurance department,
as held in *Farmer's Mutual Insurance Co. v. Cole, supra,* has
nothing to do in the world with the supervising of inter-insur-
ance, which has no capital stock, no organization, no profit, no
stockholders, and exists merely for mutual protection; fifth,
that, so far from being contrary to public policy, this sort of
insurance should be fostered by public policy, as a wholesome

thing for the citizens of the state; sixth, that the right by private contract to enter into the particular sort of inter-insurance disclosed by this agreed statement of facts is a right guaranteed by the fourteenth amendment of the Constitution of the United States; and, finally, as a consequence, that the court below acted correctly in discharging the defendant, Alley.

The case of *State v. Stone,* 118 Mo. 388, 24 S. W. 164, 25 L. R. A. 243, 40 Am. St. Rep. 388, is a case where the kind of insurance known as Lloyd's was involved. Lloyd's insurance is simply one of the many kinds of general insurance. That sort of insurance is conducted for profit. Corporations engaged in the Lloyd's insurance sell insurance to the public; hence that case has no application here whatever.

I regret the necessity of differing from my Brethren in this case. I am wholly unable to see any scheme here, or strategy, or trick, seeking to evade our insurance laws. The whole plan of inter-insurance, as here disclosed in the agreed statement of facts, appears to me plainly as simply an effort on the part of the lumber interests to secure insurance amongst themselves at a reasonable rate, and to escape the old-line companies. If any business, the lumber business, or any other line of business, chooses to exercise the right of private contract by inter-insurance, simply to protect itself against loss by fire, at a reasonable cost, getting rid of the enormous salaries and other extraordinary expenses incident to the present-day operation of the old-line companies of insurance, I fail to see, in that sort of procedure, an effort to evade the rightful exercise of the power of our insurance department. If, in one word, all the different businesses in this country could, by inter-insurance, such as is set forth in the agreed statement of facts in this case, secure protection against loss by fire, there would be no further need for paying tribute to old-line insurance companies, in the enormous sums which are annually poured into their coffers.