## ALYEA–NICHOLS CO. v. UNITED STATES.

### SAME v. PICKERING.

(District Court, S. D. Illinois, S. D. April, 1926.)

### Nos. 17299, 17300.

**1. Statutes ⟨key⟩245.**

Revenue statutes, carrying stringent provisions for punishment for failure to file returns and pay taxes, must be construed strictly in favor of citizen.

**2. Statutes ⟨key⟩245—Provisions of revenue laws are not to be extended beyond import of language used, and tax must come clearly within letter of statute, and powers granted to officers must be strictly pursued.**

Provisions of revenue laws are not to be extended beyond clear import of language used, and tax to be sustained must come within letter of statute, and powers granted to officers charged with execution must be strictly pursued.

**3. Internal revenue ⟨key⟩9—Automobile indemnity association, through which interinsurance contracts were made, held not entity, so as to come within provisions of revenue statutes (Interinsurance Act Ill. June 20, 1921, § 1 [Laws 1921, p. 492]; Revenue Act 1916, § 10 [Comp. St. § 6336j]; Revenue Act 1917, §§ 4, 504 [Comp. St. 1918, §§ 6336jj, 6309¼a]; Revenue Act 1918, §§ 230, 503[c], 1000 [Comp. St. Ann. Supp. 1919, §§ 5980n, 6309⅓d, 6336⅛nn.]).**

Under Interinsurance Act Ill. June 20, 1921, § 1, automobile indemnity association, being mere exchange or office through which interinsurance contracts were effected, *held* not an entity, within Revenue Act 1916, § 10 (Comp. St. § 6336j), Revenue Act 1917, §§ 4, 504 (Comp. St. 1918, §§ 6336jj, 6309¼a), Revenue Act 1918, §§ 230, 503 (c), 1000 [Comp. St. Ann. Supp. 1919, §§ 6336⅛nn, 6309⅓d, 5980n], so as to require payment of tax on capital stock, income, or premiums thereunder.

**4. Insurance ⟨key⟩52—"Mutual insurance companies" are organized by number of persons for purpose of transacting some particular insurance business.**

"Mutual insurance companies" are organized by number of persons signing articles by which they agree to associate themselves for formation of corporation, to transact some particular kind of insurance business.

[Ed. Note.—For other definitions, see Words and Phrases, Mutual Insurance Company.]

**5. Internal revenue ⟨key⟩9—Automobile insurance exchange, where subscribers agree to pay pro rata proportion of loss of fellow members, held not mutual insurance company, within Revenue Act, providing for capital stock tax (Interinsurance Act Ill. June 10, 1921, § 1 [Laws 1921, p. 492]; Revenue Act 1916, § 10 [Comp. St. § 6336j]; Revenue Act 1917, § 4 [Comp. St. 1918, § 6336jj]; Revenue Act 1918, §§ 503[c] 1000 [Comp. St. Ann. Supp. 1919, §§ 6309⅓d, 5980n]).**

Automobile indemnity association, being, under Interinsurance Act Ill. June 20, 1921, § 1 (Laws 1921, p. 492), an exchange or place where contracts of indemnity were issued, *held*

not a "mutual insurance company," within Revenue Act 1916, § 10 (Comp. St. § 6336j), Revenue Act 1917, § 4 (Comp. St. 1918, § 6336jj), Revenue Act 1918, §§ 503[c], 1000 (Comp. St. Ann. Supp. 1919, §§ 6309⅓d, 5980n), imposing taxes on capital stock, income, and premiums.

**6. Insurance ⟨key⟩180—"Insurance premium" ordinarily is sum paid by insured to some entity insuring one against loss of particular kind.**

An "insurance premium" ordinarily is sum of money that is paid by insured to some entity, who for such consideration insures insured against loss of particular kind.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Premium.]

**7. Estoppel ⟨key⟩3(3)—That in action against alleged insurance association it was alleged in defense, for purpose of coming within statutes of state where suit was brought, that defendant was association, held not to estop attorney in fact from denying it was "association," within meaning of revenue laws (Gen. St. Kan. 1915, §§ 5456–5466).**

That in action against alleged insurance association, which was in fact collection of individuals exchanging interinsurance contracts, on insurance contract, defendant's pleading alleged defendant was "association" of individuals, under Gen. St. Kan. 1915, §§ 5456–5466, purpose of pleading being to bring it within such statutes, and defend on other grounds rather than capacity in which it was sued, *held* not to prevent attorney in fact from recovering taxes on theory that it was not association, within meaning of United States revenue laws.

**8. Statutes ⟨key⟩245—If words of statute under which taxes were collected leave doubt as to whether taxes should have been collected, it must be resolved in favor of taxpayer.**

If words used in statute under which taxes against automobile insurance association were collected leave a doubt as to whether or not taxes should have been collected, doubt must be resolved in favor of taxpayer.

**9. Internal revenue ⟨key⟩38—Attorney in fact for interinsurance subscribers, entitled to possession of funds paid by subscribers, held to have right to maintain action for recovery of taxes levied and assessed against alleged association.**

Attorney in fact for subscribers exchanging interinsurance contracts, having charge of funds paid by individual subscribers, and entitled to possession and use in transaction of business, *held* to have right to maintain action to recover taxes levied and collected against alleged association.

**10. Internal revenue ⟨key⟩9—Taxes collected from automobile insurance exchange association held not authorized by revenue statutes (Revenue Act 1916, § 10 [Comp. St. § 6336j]; Revenue Act 1917, §§ 4, 504 [Comp. St. 1918, §§ 6336jj, 6309¼a]; Revenue Act 1918, §§ 230, 503 [c], 1000 [Comp. St. Ann. Supp. 1919, §§ 5980n, 6309⅓d, 6336⅛nn]).**

Revenue taxes on capital stock, income, and premiums, collected from automobile in-

demnity association, which was merely name of place at which individuals exchanged interinsurance contracts through an attorney in fact, *held* not authorized by Revenue Act 1916, § 10 (Comp. St. § 6336j); Revenue Act 1917, §§ 4, 504 (Comp. St. 1918, §§ 6336jj, 6309¼a); Revenue Act 1918, §§ 230, 503 [c], 1000 (Comp. St. Ann. Supp. 1919, §§ 5980n, 6309⅓d, 6336⅓nn).

At Law. Separate actions in assumpsit by the Alyea-Nichols Company against the United States and against John L. Pickering, former Collector of Internal Revenue for the Eighth District. Judgment for plaintiff.

Rufus M. Potts and C. W. Armstrong,
Rufus M. Potts, C. W. Armstrong, and Joseph W. Cox, all of Chicago, Ill., for plaintiff.
Thos. Williamson, U. S. Dist. Atty., of Springfield, Ill., and Forest D. Siefkin, Sp. Counsel, of Chicago, Ill., for the United States.

FITZHENRY, District Judge. These are actions in assumpsit, brought by plaintiff against defendants, to recover revenue taxes which had been levied and assessed against "Belt Automobile Indemnity Association," a reciprocal or interinsurance exchange, established in accordance with the laws of the state of Illinois, upon schedules which plaintiff was required by the revenue officers of defendants to fill out and file. The first entitled cause (17299) is brought under the Tucker Act (24 Stat. 505), the amount in controversy being less than $10,000. The other suit is against the former collector of internal revenue and involves the same questions.

It is claimed by plaintiff that the taxes sought to be recovered were wrongfully, erroneously, illegally and unjustly assessed against "Belt Automobile Indemnity Association," and collected through duress and under protest from the Alyea-Nichols Company, the attorney in fact, from funds in its hands of the individual subscribers, respectively, exchanging contracts of indemnity at the interinsurance exchange. The government claims that the taxes were legally assessed against "Belt Automobile Indemnity Association," upon the authority of law opinion 1063, which holds in effect that the exchange ("Belt Automobile Indemnity Association") constituted a mutual insurance company, and these suits have been defended upon that theory.

The Commissioner of Internal Revenue and the collector for the Eighth district of Illinois demanded that returns be made of the taxes, as set forth in the declaration in these cases, and upon a form submitted by the collector in the name of "Belt Automobile Indemnity Association," and such returns were so filed in compliance with said demand, and upon the form required for the taxes sought to be recovered herein, and were filed under protest and duress. Proper application for refund was denied.

Plaintiff is a corporation organized and existing under and by virtue of the laws of the state of Illinois and is now, and either it or its predecessors, C. J. Alyea and F. C. Nichols, a partnership, has been, during the time covered by these suits, the attorney in fact for the subscribers at "Belt Automobile Indemnity Association." Alyea-Nichols Company has been and is duly licensed by the director of trade and commerce of the state of Illinois, as was its predecessor, to exchange contracts of indemnity between subscribers at "Belt Automobile Indemnity Association," in accordance with an act entitled "An act concerning the business of reciprocal and interinsurance," approved June 20, 1921, of the laws of Illinois. Laws 1921, p. 492. Prior to the enactment of this statute, the attorney in fact was licensed under and in accordance with section 13½, added by Laws 2d Sp. Sess. 1912, p. 51, to the Mutual Casualty Act of 1905 (chapter 73, § 321½, Hurd's R. S. 1913).

In process of operation, a subscriber, wishing to indemnify himself against loss by reason of the possession, operation, injury, or destruction of his automobile, executed an application and power of attorney. If the application was accepted, a policy was issued, and those documents constituted the contracts between the attorney in fact and the subscriber, and the subscribers with each other, at the "Belt Automobile Indemnity Association." Accompanying the application and power of attorney was a deposit, which the subscriber paid to the attorney in fact upon a three-year contract—for fire and theft, $7.50; collision, $7.50; liability and property damage, $7.50. If a loss occurred, the attorney in fact would adjust it and make settlement with the subscriber to be indemnified, and the amount of the loss would be prorated among the several subscribers and paid out of each subscriber's funds deposited with the application, in the hands of the attorney in fact; the entire system being one to secure to each individual subscriber insurance against risks at absolute cost, no compensation being paid to anybody on behalf of the subscribers, except a small pay-

ment to the attorney in fact, who acted as the separate agent of each individual subscriber. The enterprise is purely co-operative, taking upon itself no corporate form, nor exercising any corporate functions.

The "Belt Automobile Indemnity Association" is the name given to the place where the interinsurance contracts of the several subscribers were exchanged among the subscribers, by the attorney in fact acting for each. In other words, the name just quoted is the name of a place, the office of the attorney in fact or the exchange. The application and power of attorney are in the same document, the material parts of which are as follows:

"At the Belt Automobile Indemnity Association of El Paso, Illinois, U. S. A.

"Subscriber's Power of Attorney and Application.

"The office of Alyea-Nichols Company in El Paso, Illinois, having been selected by automobile owners as a place at which they may exchange contracts of insurance, such place being designated 'the Belt Automobile Indemnity Association,' I, as a subscriber thereat, hereby appoint Alyea-Nichols Company my attorney in fact with power to substitute any other person or persons that said attorney may select, subject to the approval of the advisory committee.

"Said attorney shall exchange for me with other subscribers at said association, contracts of insurance, and shall have power to make, issue, change, modify, reinsure or cancel contracts containing such terms, clauses, conditions, warranties, and agreements as said attorney shall deem best: Provided, however, my attorney shall not make me jointly liable with any other subscriber, but shall bind me separately and alone, and, for not more than my pro rata share on any one contract; to demand, collect, receive, and receipt for all moneys due me, or for credit to my account as a subscriber; to waive, give, or receive all notices or proofs of loss; to adjust and settle all losses and claims under such contracts; to perform or waive all agreements or stipulations of any such contracts; to accept service of process and appear for me in suits, actions, or proceedings under contracts issued at said association, and bring, prosecute, defend, compromise, settle, or adjust same; to perform every act not herein mentioned that I could myself do in relation to any contract hereby authorized.

"Said attorney is hereby further author-ized for me to execute any and all documents and to do any acts necessary to effect compliance with the laws of any state or the requirements of the insurance department of any state with respect to the exchange of insurance herein provided for; also to appoint the insurance superintendent or corresponding official of any state my agent on whom service of process may be had in any suit, action, or proceeding brought under any policy issued at said association. There shall be no joint funds, capital or stock, but my attorney shall keep a separate account open to my inspection of all moneys paid by me as a result of this instrument.

"An advisory committee consisting of five subscribers to act for one year shall be selected at each annual meeting of subscribers, to be held on the second Saturday in May of each year, unless said day fall on a legal holiday, in which event such meeting shall be held on the following Monday. If a member of the advisory committee shall cease to keep his insurance in force at the association, he shall cease to be a member of such committee, and the remaining members thereof shall have power to fill the vacancy.

"The attorney in fact shall receive as compensation the three years application fee which I agree to pay for each automobile insured by me; also a transfer fee of $1, which I agree to pay each time my policy is transferred from the automobile to another owned by me; and 10 per cent. commission on all other money deposited or paid by me on account of this contract. From the compensation above provided, said attorney shall pay all expenses incident to the conduct of said association, except the items hereinafter mentioned.

"For the payment of losses, legal and adjustment expenses, insurance department fees and charges, taxes, premiums on surety bonds, and stationery and postage for collecting subscribers' deposits, I agree to deposit with the attorney in fact, from time to time, when called for by said attorney, a sufficient sum of money to pay my equitable proportion of the items last mentioned. From the gross amount of such deposits so made, my attorney shall pay said expenses, charging each subscriber's deposit with his equitable share thereof. The attorney in fact is also to be allowed, as part of their compensation as above provided, 10 per cent. commission on all deposits made by me under this provision. Any subscriber failing to deposit the amount called for by the attorney within 30 days from the date such call is mailed, directed to him at his last known ad-

dress as shown by the records of the association, shall forfeit all his rights as a subscriber at said association so far as losses subsequently incurred by him are concerned: Provided, he may be reinstated within such time and for such period and on such terms as may be stipulated by the attorney in fact.

"Subscribers' deposits shall be kept in banks, or invested in securities, approved by the advisory committee, and all disbursements therefrom shall be by check of the attorney in fact.

"Good and sufficient bonds shall be given by the attorney in fact to be approved by the advisory committee, conditioned that they will well and truly use, maintain, and account for all of the subscribers' funds deposited with them.

"This instrument may be revoked or canceled, effective at noon, on the last day of any calendar month, by either party giving to the other five days prior notice in writing, and notice mailed by either party to the other's address, as shown by the records of the association, shall be sufficient notice. Thereupon my attorneys shall cancel all unexpired insurance granted by me, or to me, under this instrument, liquidate my account and return to me my unused deposits, less the 10 per cent. commission thereon above authorized. If cancellation is at the request of the attorney in fact, there shall be refunded to me the unearned portion of the application fee; but, if the cancellation is at my request, no part of the application fee shall be returnable to me.

"The personal pronoun herein used to refer to the subscriber shall apply regardless of number or gender.

"Application fees for three years—fire and theft, $7.50; collision, $7.50; liability and property damage, $7.50."

Then followed a schedule of warranties by the subscriber relative to the particular type and make of his automobile upon which he desires indemnity coverage, which schedule is, for the purposes of these suits, immaterial.

When the application was accepted by the attorney in fact, a contract of interinsurance was exchanged between the subscribers, the material parts of the form used are as follows:

"Subscribers at the Belt Automobile Indemnity Association, El Paso, Illinois (herein called 'association') do hereby severally agree to indemnify ———, of ———, in the county of ———, and state of ——— (herein called 'subscriber') on the automobile described in the schedule of warranties attached hereto. * * *"

Then follows the schedule of perils insured against, and the conditions upon which the contract is issued, among which are:

"*Character of Association.* L. The subscribers at the Belt Automobile Indemnity Association are individuals, firms, or corporations that have each executed an agreement (hereby made a part hereof) which vests in the Alyea-Nichols Company, herein called 'attorney,' power to issue this contract for them. It is understood and agreed that there is assumed by each subscriber, severally, and not jointly with any other subscriber, a portion of the aggregate liability hereunder not in excess of his equitable pro rata share thereof, considering the aggregate amount of all deposits, made for the period in which the loss may occur, by subscribers carrying the same kind of insurance at the association at the time of the loss.

"*Definition.* M. Whenever the word 'contract' occurs herein, it means and shall be taken and construed to mean this contract in its entirety which is issued to the subscriber named herein in exchange for, and in consideration of, insurance extended by him to the other subscribers."

Under the contract, from the sums deposited by each subscriber with the attorney in fact, it was authorized to deduct ten per cent. as its compensation for carrying on the interinsurance business of the subscribers, the remaining 90 per cent. was passed to the credit of each individual subscriber, with whom a separate account was kept, and the aggregate thereof deposited in the bank in a single account by the attorney in fact, or invested in securities. The attorney in fact paid all of the operating expenses of his exchange, but when a loss occurred, or expense was incurred for counsel fees, insurance department fees, taxes, premiums, or surety bonds, the proportionate shares thereof were charged to each individual account and paid out of the 90 per cent. fund which was aggregated by the attorney in fact. At the end of each six months period, the accounts were balanced and credited with the difference between the original deposit of the subscriber and the amount expended, except that upon this periodical settlement a small sum was set aside for unreported losses, or unusual expenses which could not be ascertained beyond estimate. At those periodical settlements, this item usually amounted to $2.60. If a subscriber withdrew, this sum was withheld to meet the unreported losses and the unusual expenses which had not been ascer-

tained. When a new subscriber came in, he got the benefit of this amount that was withheld from the settlement with the old subscriber, and whether or not there ever was an actual final full settlement between the retiring subscriber and the attorney in fact after the items for which the $2.60 was reserved to meet, is ascertained, it is contended that he has had the benefit of and received it at the beginning of his relations with the attorney in fact. The settlement of the question, however, as to whether or not a retiring subscriber ever gets a full or final settlement with the attorney in fact as to the $2.60, reserved for unascertained losses, is not decisive of the questions here involved.

To each of the declarations the defendants have filed their pleas of the general issue, so that the question raised in each is whether defendants are in possession of moneys which in equity and good conscience belong to plaintiff.

Section 1000 of the Revenue Act of 1918 (Comp. St. Ann. Supp. 1919, § 5980n) levies a capital stock tax. Paragraph (c) provides:. " * * * The taxes imposed by this section shall apply to mutual insurance companies."

Section 10 of the Revenue Act of 1916 (Comp. St. § 6336j) levies a tax "upon the total net income received in the, preceding calendar year from all sources by every corporation, joint-stock company or association, or insurance company, organized in the United States, no matter how created or organized, but not including partnerships."

Section 4, title I, of the Revenue Act of 1917 (Comp. St. 1918, § 6336jj), levies an income tax upon "every corporation, joint-stock company or association, or insurance company." This same section also provides, in the second paragraph, the manner of computing the tax provided for in the first paragraph, with this exception: "That for the purpose of the tax imposed by this section the income embraced in a return of a corporation, joint-stock company or association, or insurance company, shall be credited with the amount received as dividends upon the stock or from the net earnings of any other corporation, joint-stock company or association, or insurance company, which is taxable upon its net income as provided in this title."

Section 230, title II, Revenue Act of 1918 (Comp. St. Ann. Supp. 1919, § 6336⅛nn), provides a corporation tax in lieu of section 10, of the act of 1916, as amended by the act of 1917 and by section 4 of the act of 1917.

Section 504 of the Revenue Act of 1917 (Comp. St. 1918, § 6309¼a), provides for taxes on the issuance of insurance policies. Paragraph C, Casualty Insurance, levies a tax equivalent to "1 cent on each dollar or fractional part thereof of the *premium* charged under each policy of insurance or obligation of the nature of indemnity for loss, damage, or liability * * * issued or executed or renewed by any person, corporation, partnership, or association, transacting the business of employers' liability, * * * automobile, or other branch of insurance."

Section 503 (c) of the Revenue Act of 1918 (Comp. St. Ann. Supp. 1919, § 6309⅛d) makes a levy in lieu of that provided in section 504 (c) of the act of 1917, as follows:

"(c) Casualty insurance: A tax equivalent to 1 cent on each dollar or fractional part thereof of the *premium* charged under each policy of insurance or obligation of the nature of indemnity for loss, damage, or liability ' * * * issued or executed or renewed by any person transacting the business of, * * * automobile, or other branch of insurance (except life insurance, and insurance described and taxed in the preceding subdivision): Provided, that in case of policies of insurance issued on the industrial or weekly or monthly payment plan the tax shall be 40 per centum of the amount of the first weekly *premium* or 20 per centum of the amount of the first monthly *premium,* as the case may be;"

[1] It must be borne in mind that the taxes here involved were levied and assessed against "Belt Automobile Indemnity Association," not against plaintiff or any of the individual subscribers at the exchange. They were paid by plaintiff out of the individual moneys of the several subscribers and it (plaintiff) was the individual agent in custody of funds belonging to the subscribers severally and which were impressed with a particular purpose. Unless the "Belt Automobile Indemnity Association" comes clearly within the provisions of the revenue statutes here involved, then plaintiff is entitled to recover the moneys paid by it under protest and duress. The revenue laws of 1916 (39 Stat. 756), 1917 (40 Stat. 300), 1918 (40 Stat. 1057), and 1921 (42 Stat. 227), carry stringent provisions for the punishment of persons, associations and corporations for not filing returns and paying their taxes. In such a case, the statutes involved should, and must be, construed strictly in favor of the citizen. Parker v. Overman, 18 How. 137, 15 L. Ed. 318; McClung v. Ross, 5 Wheat. 116, 5 L. Ed. 46; Williams v. Peyton, 4 Wheat. 77, 4 L. Ed. 518.

[2] As a general rule, revenue laws, such as laws imposing taxes and licenses, are neither remedial laws, nor laws founded upon any permanent public policy; but, on the contrary, operate to impose burdens upon the public, or to restrict them in the enjoyment of their property and the pursuit of their occupations, and are therefore construed strictly. The provisions of such statutes are not to be extended beyond the clear import of the language used; in order to sustain the tax, it must come clearly within the letter of the statute, and the powers granted to officers charged with its execution must be strictly pursued. 36′ Cyc. 1189.

In order to sustain the capital stock tax levied under section 1000 of the Act of 1918, it must be established that "Belt Automobile Indemnity Association" is a "mutual insurance company." To sustain the income tax collected under section 10 of the Revenue Act of 1916, it must be determined that the exchange is either a "corporation, joint-stock company or association, or insurance company." In order to sustain the income tax under section 4, title I, of the Act of 1917, it must come within one of the same designations. In order to sustain the tax collected under section 504 of the Act of 1917, it must be determined that "Belt Automobile Indemnity Association" collected premiums and issued policies of insurance or obligations of the nature of indemnity, and that it was a "person, corporation, partnership or association," transacting the business of "automobile or other insurance," and the same might be said as to the tax collected under section 503 (c) of the Act of 1918, as well as the pertinent provisions of the Revenue Act of 1921.

Reciprocal or interinsurance was a recognized device whereby a number of persons had determined to carry their own insurance of various kinds for many years in this country prior to the enactment of any of the state statutes upon the subject. It was undoubtedly suggested by the methods used by Lloyd's Insurers, which flourished in England at an early date, though the plan is based upon vitally different lines and involves four very material elements: (1) A place for the exchange of contracts of indemnity; (2) a common agent or attorney in fact for each of the several persons desiring to exchange contracts of indemnity with others; (3) a number of subscribers (not less than a fixed number), who were desirous of exchanging contracts, assuming only several liabilities; and (4) a deposit by the subscriber with his agent

of sufficient money to pay his pro rata share of the losses incurred by any of those subscribers to the device within a given time.

In the statement of fact, the process of doing business was explained. The place of business was designated by the name of "Belt Automobile Indemnity Association." It had no capital stock; it issued no policy of insurance or contract of indemnity, collected no premiums, and had no income. It was and is neither a natural nor an artificial person.

The Illinois Reciprocal or Interinsurance Act, approved June 20, 1921 (Laws 1921, p. 492) section 1, explains three of the material elements just suggested, and their meaning, as follows:

"*Exchange—Subscriber—Attorney in Fact.* That the word 'exchange' when used in this act, shall mean the office of the attorney in fact, being the place where the contracts of indemnity are issued; that the word 'subscriber,' when used in this act, shall mean the participant or policy holder; that the words 'attorney in fact' when used in this act, shall mean the representative of the subscriber."

Statutes similar to the Illinois act had been adopted in probably half of the states of the Union at the time of the enactment of the several revenue laws involved in this case, and the method or device of reciprocal or interinsurance was well known throughout the country.

[3] So, it must be held that "Belt Automobile Indemnity Association," being merely the exchange or office of the attorney in fact, was not an entity of any kind, and did not come within any of the descriptions of entities referred to in the foregoing statutes.

[4] Counsel for the government, however, contend that the exchange, attorney in fact, and the numerous individual subscribers have been engaged, as shown by the evidence, in the enterprise of insurance or indemnity and should be held to be a mutual insurance company. Mutual insurance companies are organized by a number of persons signing articles by which they agree to associate themselves for the formation of a corporation for the purpose of transacting some particular kind of insurance business.

In discussing insurance companies and their difference, the Supreme Court of the United States said: "The real difference between the two classes of life companies as now conducted lies in the legal right of electing directors and officers. In the stock company stockholders have that right; in the mutual companies, the policy holders who

are the members of the corporation." Penn. Mutual L. Ins. Co. v. Lederer, Coll., 252 U. S. 523, 40 S. Ct. 397, 64 L. Ed. 698.

If the subscribers at the exchange here involved may be called policy holders, it could not be said of the interinsurance plan, for they have no such voice, and when Congress said, in section 1000 of the Revenue Act of 1918, in levying the capital stock tax, "the taxes imposed by this section shall apply to mutual insurance companies," it undoubtedly intended to give the quoted words their usual and ordinary meaning. Lynch v. Turrish, 247 U. S. 221, 38 S. Ct. 537, 62 L. Ed. 1087; United States v. Merriam (United States v. Anderson) 263 U. S. 179, 44 S. Ct. 69-71, 68 L. Ed. 240, 29 A. L. R. 1547. In the latter case the Supreme Court said (263 U. S. 187, 188, 44 S. Ct. 71):

"On behalf of the government it is urged that taxation is a practical matter and concerns itself with the substance of the thing upon which the tax is imposed rather than with legal forms or expressions. But in statutes levying taxes the literal meaning of the words employed is most important for such statutes are not to be extended by implication beyond the clear import of the language used. If the words are doubtful, the doubt must be resolved against the government and in favor of the taxpayer. Gould v. Gould, 245 U. S. 151, 153, 38 S. Ct. 53, 62 L. Ed. 211. The rule is stated by Lord Cairns in Partington v. Attorney General, L. R. 4 H. L. 100, 122: 'I am not at all sure that in a case of this kind—a fiscal case—form is not amply sufficient; because, as I understand the principle of all fiscal legislation, it is this: If the person sought to be taxed comes within the letter of the law, he must be taxed, however great the hardship may appear to the judicial mind to be. On the other hand, if the crown, seeking to recover the tax, cannot bring the subject within the letter of the law, the subject is free, however apparently within the spirit of the law the case might otherwise appear to be. In other words, if there be admissible in any statute what is called an equitable construction, certainly such a construction is not admissible in a taxing statute, where you can simply adhere to the words of the statute.'"

[5] So that we conclude that "Belt Automobile Indemnity Association, being the exchange, the attorney in fact and his several subscribers do not constitute a mutual insurance company within the meaning of the Revenue Acts here involved.

It is not seriously contended on behalf of the government that the alleged entity against which the taxes involved in these suits was levied, is either a corporation or joint-stock company, nor has it been contended that it was any kind of an insurance company other than a mutual insurance company, which we have just discussed.

It seems to the court that the exchange, attorney in fact, and the individual subscribers, considered jointly, would more clearly come within the description of "association" than that of any other entity mentioned in the statute upon which the taxes sought to be recovered could be levied, though the Supreme Court of the United States has effectually disposed of this contention in Hecht v. Malley, 265 U. S. 144-157, 44 S. Ct. 462-467 (68 L. Ed. 949), where the court was discussing this word in the identical connection in which we are now required to apply it:

"The word 'association' appears to be used in the act in its ordinary meaning. It has been defined as a term 'used throughout the United States to signify a body of persons united without a charter, but upon the methods and forms used by incorporated bodies for the prosecution of some common enterprise.' 1 Abb. Law Dict. 101 (1879); 1 Bouv. Law Dict. (Rawle's 3d Rev.) 269; 3 Am. & Eng. Enc. Law (2d Ed.) 162; and Allen v. Stevens, 33 App. Div. 485, 54 N. Y. S. 8, 23, in which this definition was cited with approval as being in accord with the common understanding. Other definitions are: 'In the United States, as distinguished from a corporation, a body of persons organized, for the prosecution of some purpose, without a charter, but having the general form and mode of procedure of a corporation.' Webst. New Internat. Dict. '(U. S.) An organized but unchartered body analogous to but distinguished from a corporation.' Pract. Stand. Dict."

The Supreme Court was passing upon the character of the so-called Massachusetts trusts. The court was discussing the Hecht Real Estate Trust, the Haymarket Trust, and the Crocker, Burbank & Company Association. These trusts were unincorporated and the features of all three of them were described by the court. The description of one is sufficient (265 U. S. 148, 44 S. Ct. 463): "The Haymarket Trust is strictly a business enterprise. It was established by the original subscribers who furnished the money for the purchase of a building in Boston used for store and office purposes. The shares are of the par value of $100 each. Except as otherwise restricted, the trustees have general and exclusive powers of management, but no power to bind the certificate holders person-

ally. At any annual or special meeting of the certificate holders, they may fill any vacancies in the number of trustees, depose any or all the trustees and elect others in their place, authorize the sale of the property or any part thereof, and alter or amend the agreement of trust."

The court held, naturally, that the Massachusetts trusts there under consideration came clearly within the definitions above quoted, upon the theory that while the trusts had no charter, they were conducted upon the methods and forms used by incorporated bodies for the prosecution of the same common enterprise. This is not true, as shown by the evidence in this case, as to the "Belt Automobile Indemnity Association," the exchange, the attorney in fact and the subscribers, construed most favorably to the contention of the government.

Counsel for the government, in their earnest effort to have the statutes in question construed to cover the system of interinsurance, compared the advisory committee provided for in the power of attorney with the board of directors of a corporation engaged in the insurance business. This, upon the theory that "the attorney in fact is controlled by an advisory committee elected from and by the subscribers." An examination of the power of attorney discloses that the so-called "advisory committee" does not have the power to exercise any control whatever over the actions of the attorney in fact. If the conduct of the agency by the attorney in fact is unsatisfactory to the subscriber, he has but one remedy—to withdraw from the interinsurance system and withdraw the unexpended portion of his deposit to meet losses.

[6] It is claimed that under the interinsurance system the "amount of premium is ascertained, collected, and disposed of in the same way" as in ordinary insurance cases. The error of the government in its position with reference to the taxes involved is well illustrated by the manner in which it confounds the so-called premium deposits made by the subscriber with the attorney in fact and the word "premium" as used in the taxing statutes. An insurance premium, ordinarily, is a sum of money that is paid by the insured to some entity, who, for that consideration, insures the insured against loss of a particular kind. Under the system of interinsurance shown by the record in this case, there is no premium paid to any entity for the considerations above described. The consideration given by each subscriber for the protection afforded him by the system is clearly his agreement to pay his proportionate share of losses to other subscribers in consideration of their agreement to indemnify him for the loss which he may sustain. The money deposited, the record shows, was not even required under the system under which the "Belt Automobile Indemnity Association" exchange operated prior to the enactment of the statute of 1921. Under the practice then in vogue, when the losses were ascertained, the attorney in fact called upon each subscriber to pay his proportionate share thereof, but since the enactment of that statute the subscriber is required to make a deposit of an ascertained sum in the hands of the attorney in fact, so that it will be available to pay the subscriber's proportionate share of the loss, as soon as ascertained.

The attorney in fact is the limited agent of the subscriber, acting for him in the exchange of contracts, and holding the deposit made by the subscriber in readiness to meet the subscriber's obligation. The making of the deposit does not change the character or legal effect of the relations between the subscribers, nor the relation which exists between the individual subscriber and his individual agent, the attorney in fact. The possession of the deposit funds by the agent is, and as a matter of law must be, the possession of the subscriber. So, in contemplation of law, no portion of the deposit leaves the custody of the subscriber, except the 10 per cent. thereof which is paid to the attorney in fact as his compensation and to pay his expenses of maintaining his office, the exchange.

[7] It is contended that because, in a suit in Kansas (Stanley v. Belt Indemnity Association, 112 Kan. 412, 210 P. 1096) to recover upon one of the insurance contracts exchanged by the plaintiff, it elected not to seriously question the name under which it was sued, but sought to defend upon the merits, defendant's pleading denied that it was a corporation, but alleged that it was an "association of individuals authorized to exchange insurance contracts with each other as provided by sections 5456 to 5466, General Statutes of Kansas," it was thereby estopped here to deny that it is an association within the meaning of the revenue laws of the United States. It is apparent from the part of the pleading quoted that the purpose of the pleader was to bring the party defendant within certain statutes of the state of Kansas, and to defend upon other considerations rather than the capacity in which the defendant was sued. As other material considerations might legally have presented

themselves for the position taken in that case, we do not believe that it is especially helpful to determine the character of the "Belt Automobile Indemnity Association," nor does it take away from the attorney in fact the right to insist that taxes illegally and unlawfully collected from it be returned. In the opinion in that case, it is true, the court held that the exchange was a mutual indemnity association to the extent that it was within the statute of Kansas (section 5479, Gen. Stats. 1915) providing for the allowance to plaintiff of a reasonable sum as attorney's fees to be collected as a part of the costs.

To sustain the position that interinsurance associations similar to the plaintiff are unincorporated or voluntary associations, the government cites and relies upon State v. Alley, 96 Miss. 720, 51 So. 467, Sergeant v. Goldsmith Dry Goods Co., 110 Tex. 482, 221 S. W. 259, 10 A. L. R. 742, Thomas Canning Co. v. Canners' Exchange Subscribers, 219 Mich. 388, 189 N. W. 214, and Warfield-Pratt-Howell Co. v. Williamson et al., 233 Ill. 487, 84 N. E. 706.

In State v. Alley, supra, the court found that the defendant was a foreign insurance company within the provisions of section 2562 of the Mississippi act (Code 1906), quoted in the opinion, which defines a foreign insurance company to mean, "all corporations, associations, partnerships or individuals," engaged in any kind of insurance. It is also held that an interinsurance exchange is neither a stock company nor a mutual company. The holding that defendant was a foreign insurance company within the meaning of the Mississippi statute brought about an amendment thereto, expressly providing that the statute should not be construed to include or extend to "individuals, partnerships, associations or corporations, foreign or domestic, who seek to provide indemnity among themselves from fire loss or other casualty by exchange of private contracts for protection only and not for profit."

In Sergeant v. Goldsmith Dry Goods Co., supra, the Texas court simply held that an interinsurance exchange was an unincorporated association and not a partnership, as to outsiders, and then only upon the principle of estoppel.

In Thomas Canning Co. v. Canners' Exchange Subscribers, supra, the defendant was licensed to do business in Michigan, through an attorney. In that case, and also the case of Mountain Timber Co. v. Manufacturing Woodworkers Underwriters, 98 Wash. 167, 167 P. 93, also cited by defend-

ants, the defendant appeared and pleaded generally, and the exact identity of the enterprise was not determined.

In Warfield-Pratt-Howell Co. v. Williamson et al., supra, the exchange under consideration was an "association," because the members had subscribed to articles of association, and it was admitted in the pleadings that the Merchant Underwriters was an incorporated association, but in that case the court held that suit might be brought against the attorney in fact.

Defendants cite William Penn Motor Indemnity Exchange v. George Tennous, No. 450, March term, 1923, court of common pleas of Beaver county, Pa. This was a suit brought in the name of the exchange itself to recover an assessment made by the attorney in fact against a subscriber to meet losses which had been sustained. Judge Reader, in a written opinion filed, held that the Act of June 27, 1913 (P. L. 634), under which the exchange had been organized, "did not provide for the creation of mutual insurance corporations, but, on the contrary, provided exclusively for the carrying on of the insurance business by individuals. * * * The purpose of the act is to provide for the execution and issuing of individual contracts of insurance of indemnity. * * * We are satisfied from a consideration of all the provisions of the act that it creates no corporation, partnership, or association as an entity for the purpose of entering into and issuing contracts of insurance, but that it provides merely for the execution and exchange of such contracts by and among such individual persons, partnerships or corporations as may become parties to such contracts as such and that the resulting liability is and always remains that of individual contracting parties."

He also held that a like conclusion must be reached from a consideration of the provisions of the agreement. After examining the contract, Judge Reader uses language which is very applicable to the contention of the plaintiff here: "When we come to the contract of insurance itself we find that at the very beginning the contract does not purport to be made by or on behalf of William Penn Motor Indemnity Exchange. On the contrary, the contracting parties issuing the contract of insurance are those described, 'the subscribers at William Penn Motor Indemnity Exchange, Pittsburg, Pennsylvania (herein called the exchange), in consideration of the warranties and the deposit premium hereinafter mentioned, do indemnify and insure the subscriber named and described

herein.' It is quite evident that the contract of insurance evidenced by this policy is not made between William Penn Motor Indemnity Exchange and the defendant, but between the individual subscribers and the defendant."

It had been stipulated by the parties that the real plaintiff was William Penn Underwriters, Incorporated, and that when judgment was directed to be entered, etc., it was directed to be entered in favor of the William Penn Underwriters, Incorporated, and not the exchange. In that case Judge Reader reached this conclusion: "That the execution of reciprocal contracts of indemnity by the defendant and others, under the provisions of the Act of June 17, 1913, P. L. 624 [634], in William Penn Motor Indemnity Exchange, does not have the effect, under said act or any other provisions of the law, of creating a corporation, quasi corporation or other legal entity known as William Penn Motor Indemnity Exchange"—And entered judgment in favor of the attorney in fact.

The government also calls our attention to John L. Walker Co. v. National Underwriters Co., 3 F.(2d) 102 (7th Cir.). This was an action for damages to recover for an alleged libelous article concerning the plaintiff, a corporation. After explaining the nature of the suit and the relations of the parties, Judge Alschuler, speaking for the court, said: "In all this we find nothing to support the contention that a cause of action arising in favor of the exchange is in any way vested in the attorney in fact."

This was a decision reviewing an order of the District Court sustaining a demurrer to plaintiff's declaration. It was held that the alleged libelous article was of and concerning an organization known as Ft. Dearborn Casualty Underwriters alone, and the holding was that, in the light of the law in that case, the attorney in fact was not authorized to sue for a recovery, and that a recovery, if any were had, or permissible, would run in favor of the individuals who might be damaged. The question as to whether or not the interinsurance exchange was an entity under the Act approved June 20, 1921, in force July 1, 1921, was not before the court, and the mere reference in the opinion to the aggregate of the subscribers in the words "this unique entity created by the statute" cannot be held as an adjudication of the question. The case at bar is very different from that case in many material respects.

Shannopin Country Club v. Heiner (D. C.) 2 F.(2d) 393, was an action by the club to recover taxes which it had paid, which were imposed upon the members of the club by section 801 of the Revenue Act of 1921 (Comp. St. Ann. Supp. 1923, § 6309⅝b). The duty of the club to collect this tax as the agent of the government and deliver it to the collector was created by section 802 of the same act. (Section 6309⅝c).

Harry B. Clark v. W. Stanley Smith, as Commissioner of Insurance of the State of Wisconsin (unreported memorandum decision), was a suit in the United States District Court for the Western District of Wisconsin, to recover certain statutory fees which the commissioner of insurance had collected from the plaintiff, the attorney in fact for subscribers located in and out of the state of Wisconsin, for reciprocal or interinsurance among subscribers at his exchange. In passing upon the character of the business in which the subscribers and the attorney in fact were engaged, Judge Luse reviewed the statute governing interinsurance for the state of Wisconsin, and in many respects it resembles that of Illinois, both section 13½ of the Casualty Act of 1905, as added in 1912, and the Act of 1921. Judge Luse said:

"Sec. 201.39 (Stat. Wis. 1925) also contemplates that a 'name or designation under which such contracts are issued' may be adopted. Thus in this business of interinsurance we have a group of subscribers sharing losses under terms of contracts among themselves, entered into through an attorney in fact. The result certainly is not a company in the generally accepted sense; neither a corporation, nor voluntary association. * * * Furthermore it is clear that the subscribers to a reciprocal are not engaged in the business of insurance except incidently."

In re Associated Employers' Reciprocal, Alleged Bankrupt, No. 32581 (oral opinion), in the District Court for the Northern District of Illinois. This was a petition in involuntary bankruptcy. The petitioning creditors were endeavoring to have an interinsurance exchange, Associated Employers' Reciprocal, declared an involuntary bankrupt. Judge Wilkerson said:

"The question which is to be answered here is this: Does the relationship among the subscribers which is created by the power of attorney and policies create something which falls within the designation, 'body' or 'company' as these terms are used in the Bankruptcy Act? These terms evidently mean something which is a unit or entity in its dealings with third parties. In their dealings among themselves we have, with

reference to every policy a subscriber who is the insured on the one side; and on the other side we have a group composed of the remaining policy holders, each group being different in those who compose it from the other groups of insurers. Light is thrown upon this question by a consideration of clause 16 of section 1, in its relation to the provisions of these policies as to the limitations upon the contributions of each subscriber. A body or a company falling within the operation of the act must be one which has liabilities within the meaning of the act. Can it be said that as among themselves the 'body' or 'company' is liable to the subscribers as an entity or unit? The liability in each case is that of the individual subscribers—to the insured subscribers under their contracts. The amount which it is agreed to be paid under each policy is limited. A policy for $10,000 is not an absolute agreement to pay $10,000. It is an agreement to pay out of the contribution of the other subscribers. So far as relations among the policy holders are concerned, it is not conceivable that a situation can be created which may be characterized as insolvency.

"I think, therefore, * * * it cannot be said that the relation among the subscribers to this interinsurance plan creates something which is covered by the term 'unincorporated company,' or by the term 'body,' as it is used in the Bankruptcy Act. * * * We can stop when we arrive at the conclusion that we do not have under this arrangement disclosed by these contracts of insurance an 'unincorporated company' within the meaning of the Bankruptcy Act."

The petition in involuntary bankruptcy was dismissed. While no question under the Bankruptcy Law arises here, we feel the reasoning of the court in determining just what sort of a body or entity or unit the exchange was, if any, is helpful in determining the merits of the contention made by counsel on behalf of the government that "Belt Automobile Indemnity Association," at the time of the collection of the taxes here involved, was an unincorporated mutual insurance company.

[8] As to the contention of the government that, unless the plaintiff sustained the burden cast upon one claiming the benefit of an exemption from taxes, then the collection of the tax should be sustained, this upon the citation of Commercial Health & Accident Co. v. Pickering (D. C.) 281 F. 539: The rule in that case was a different one from that which is controlling here. In that case, the plaintiff was endeavoring to bring itself

within the operation of a proviso which exempted certain activities from the burden of the tax. There is no effort here to bring the plaintiff within any exemption, exception or proviso. Unless it appears that the taxes here involved were collected from a taxpayer who comes clearly within the provisions of the statute levying the tax, then it is the duty of the court to hold that the tax was not levied by the statute. If the words used in the statute under which the taxes in question were collected leave a doubt as to whether or not the taxes should have been collected, the doubt must be resolved in favor of the taxpayer. United States v. Merriam (United States v. Anderson) 263 U. S. 179, 44 S. Ct. 69, 68 L. Ed. 240, 29 A. L. R. 1547; Gould v. Gould, 245 U. S. 151, 38 S. Ct. 53, 62 L. Ed. 211. As Lord Cairns, whose remarks upon this subject were quoted with approval in United States v. Merriam, supra, said: "If the crown, seeking to recover the tax, cannot bring the subject within the letter of the law, the subject is free, however apparently within the spirit of the law the case might otherwise appear to be."

There is no analogy between Lloyd's Insurers and the present case. Under the system known as "Lloyd's insurance," the group insures for a consideration or premium and a policy is issued to the insured, who may or may not be associated at Lloyd's. Under that system, and in Illinois since the Act approved May 31, 1911, in force July 1, 1911 (Laws 1911, p. 371): (1) The association, partnership, individual, or aggregation of individuals was required to take a name in which they elected to do business; (2) file a verified copy of the form of policy, contract or agreement under or by which insurance is to be effected; (3) file a verified copy of the form of power of attorney, or for authority of an attorney, agent or other representative, the location of the office through which policies would be issued; and (4) file a statement that the service of process might be had upon the insurance superintendent in all suits arising out of such policy. The entire scheme contemplates entering into the insurance business generally and policies written upon property not owned by the association, partnership, individual, or aggregation of individuals by whom such contract is made, shall have printed upon the face or back of such policy or contract, in English type the words "Not incorporated." Mutual insurance companies are authorized to do business under the Illinois act. The differences between reciprocal or interinsurance and Lloyd's insurance are fundamental.

[9] The question as to the right of the attorney in fact to recover if it was found that the tax was illegally collected, was not raised, except by innuendo, until after the case had been submitted. The attorney in fact, it appears, was engaged in the business of being the individual agent of a large number of subscribers at the exchange known as the "Belt Automobile Indemnity Association." By reason of the large number of subscribers, the funds placed in its hands by the individual subscribers, aggregated a considerable sum. Under the contracts between the attorney in fact and a subscriber, the attorney in fact was entitled to the possession of those funds and their use in the transaction of its agency business. Its right to the possession of those funds could only be questioned by the subscriber, who was its principal. It was acting under a special power, created by a written instrument. The funds were collected from it by duress, it is claimed. It therefore appears that its right to the funds is, even though remotely, more than that of a naked agent, and that plaintiff has a right to maintain these actions.

[10] In the light of these considerations, we conclude that the plaintiff is a proper plaintiff; that the taxes collected did not come within the provisions of the several sections of the statutes here involved; that the plaintiff before suit, exhausted all of the remedies provided by the statute, in and about an effort to have the taxes refunded; and that the plaintiff is entitled to recover.